STATE OF MARYLAND *v.* JOSEPH CHESTER SWALES AND ELIZABETH REGINA SWALES

[No. 516, September Term, 1970.]

STATE OF MARYLAND *v.* EDWARD LINCOLN WELCH AND BERTIE BOWMAN

[No. 517, September Term, 1970.]

*Decided May 24, 1971.*

70

The causes were argued before MURPHY, C. J., and MOYLAN and POWERS, JJ.

*H. Edgar Lentz, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Joseph D. Weiner, State's Attorney for St. Mary's County,* on the brief, for appellant.

*Oliver R. Guyther* for appellees Joseph Chester Swales and Elizabeth Regina Swales. *C. Clarke Raley,* with whom were *Guyther & Raley* on the brief, for appellees Edward Lincoln Welch and Bertie Bowman.

MOYLAN, J., delivered the opinion of the Court.

Both sets of appellees here were the beneficiaries of a common pre-trial ruling denying the adequacy of an application for a search and seizure warrant. Both sets of appellees were represented by the same counsel at the

hearing below and on appeal. The State of Maryland is the appellant, urging a common ground on both appeals. Because of the unity of the issues, both appeals will be considered together in this opinion.

For approximately a four-month period, encompassing the months of October, November and December, 1968, and January, 1969, three members of the Vice-Narcotic Unit of the Maryland State Police conducted a discreet surveillance upon a suspected lottery operation in a three-county area in southern Maryland. Those observations were recited in a twenty-two-page affidavit filed in support of an application for search and seizure warrants presented to Judge James C. Mitchell, Associate Judge of the Seventh Judicial Circuit, on January 22, 1970. Deciding that probable cause for the issuance of the warrants had been shown, Judge Mitchell issued twenty-six separate search and seizure warrants. Various units of the Maryland State Police executed all of those warrants on January 22, 1970.

Seized from the home of the appellees Joseph Chester Swales and Elizabeth Regina Swales, his wife, was various lottery paraphernalia, along with $28,102.28 in United States currency. A three-count indictment was returned by the Grand Jury for St. Mary's County on March 10, 1970, charging Mr. and Mrs. Swales with (1) possession of lottery paraphernalia, (2) keeping a house for the purpose of selling lottery, and (3) permitting a house to be used as a place for selling lottery.

Seized from the home of the appellees Edward Lincoln Welch and Bertie Bowman was various lottery paraphernalia, along with $8,348.75 in United States currency. A three-count indictment was returned by the Grand Jury for St. Mary's County on March 10, 1970, charging these appellees with (1) possession of lottery paraphernalia, (2) keeping a house for the purpose of selling lottery, and (3) permitting a house to be used as a place for selling lottery.

On June 16, 1970, a motion was filed by the appellee Elizabeth Regina Swales to dismiss the indictment

against her on the ground that probable cause had not existed to authorize either her arrest or the search of her home. A hearing on this motion to dismiss was held on June 19, 1970. No transcript was made of the hearing. The motion to dismiss was denied.

On August 3, 1970, a motion was filed by the appellee Elizabeth Regina Swales requesting a reargument on her previously denied motion to dismiss. That motion recited as reason therefor (1) that "There has been newly-discovered evidence, not available to the attorneys for the defendants, which is now available to the said attorneys;" and (2) that "A more recent case decided by the Special Court of Appeals of Maryland has been published since the court's decision in the above-entitled case." The motion to permit reargument was granted. A thorough search of the record reveals neither any subsequent pleading or memorandum of law reciting newly-discovered evidence or citing a recent decision of this Court nor the transcript of any hearing at which such evidence was recited or case cited nor a record in the docket entries that any such hearing was ever held.

On August 4, 1970, a motion to dismiss the indictment against him was filed by the appellee Joseph Chester Swales on the ground that probable cause had not existed to authorize his arrest or the search of his home.

On June 19, 1970, a motion was filed by the appellees Welch and Bowman to dismiss the indictment against them on the ground that probable cause had not been shown to authorize the search of their home.

On September 8, 1970, separate orders were filed by Judge Phillip H. Dorsey, Jr., in the Circuit Court for St. Mary's County, granting the various motions to dismiss and holding in each order that probable cause did not exist to authorize the search of the premises involved or to authorize the arrest of the various appellees. Each of the orders recited the bare conclusion "that there was no showing in said warrant and application of probable cause in that the elements of probable cause were not shown by said warrant and application to exist." The

State of Maryland has appealed from each of these orders.

The single issue before us is whether there was a substantial basis for Judge Mitchell to conclude that gambling activities were going on in the two houses in question and that evidence of such activity could probably be found in those houses. We hold that there was.

Animating our decision is the philosophy permeating the opinions of the Supreme Court on the spirit in which applications for warrants must be reviewed. As that Court said in *United States v. Ventresca*, 380 U. S. 102, at 108:

> "These decisions reflect the recognition that the Fourth Amendment's commands, like all constitutional requirements, are practical and not abstract. If the teachings of the Court's cases are to be followed and the constitutional policy served, affidavits for search warrants, such as the one involved here, must be tested and interpreted by magistrates and courts in a common-sense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting."

In *Aguilar v. Texas*, 378 U. S. 108, the Supreme Court pointed out that the preference for warrants is so marked, that less persuasive evidence will justify the issuance of a warrant than would justify a warrantless search or warrantless arrest. As the Court there said, at 111:

> "Thus, when a search is based upon a magistrate's, rather than a police officer's, determi-

nation of probable cause, the reviewing courts will accept evidence of a less 'judicially competent or persuasive character than would have justified an officer in acting on his own without a warrant,' ibid., and will sustain the judicial determination so long as 'there was substantial basis for [the magistrate] to conclude that narcotics were probably present. . . .'."

This preference was reiterated in *Ventresca*, at 109:

"However, where these circumstances are detailed, where reason for crediting the source of the information is given, and when a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a common-sense, manner. Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants. *Jones v. United States, supra,* 362 U. S. at 270, 4 L.ed.2d at 707, 78 A.L.R.2d 233."

See also *Henderson v. State,* 243 Md. 342; *Tucker v. State,* 244 Md. 488; *Scott v. State,* 4 Md. App. 482; *Hall v. State,* 5 Md. App. 394; *Johnson v. State,* 8 Md. App. 187.

Basic to any decision on the existence *vel non* of probable cause are the venerable principles reaffirmed in *Ventresca,* at 107-108:

(1) "The term 'probable cause' . . . means less than evidence which would justify condemnation," *Locke v. United States,* 7 Cranch 339, 348, 3 L. Ed. 364, 367;

(2) " 'Probable cause' may rest upon evidence which is not legally competent in a crimi-

nal trial." *Draper v. United States,* 358 U. S. 307, 311; and

(3) "There is a large difference between the two things to be proved [guilt and probable cause], as well as between the tribunals which determine them, and therefore a like difference in the quanta and modes of proof required to establish them." *Brinegar v. United States,* 338 U. S. 160, 173.

The probable cause in this case, however, does not need the benefit of the preference normally extended to warrant applications over warrantless searches to be amply demonstrated. The investigation here was a model of what the patient and painstaking investigation of a gambling operation should be. The warrant application here was a model for others to emulate. The sophisticated surveillance here employed revealed a classic "pick-up man" phase of a large-scale lottery operation.

A lottery syndicate is a multi-tiered organization. The number of tiers may vary according to the size of the business, the number of its employees and the breadth of the betting clientele it serves. Be the organization large or small, however, the base of the pyramid is always the better. He is the customer who, at sometime between the afternoon of the day before and approximately noon of the day in question, gets in his wager (typically, 25 cents to one dollar) on which of one thousand possible three-digit combinations, from 000 to 999, will result from certain additions of the pari-mutuel winning totals from three pre-designated races at a pre-designated racetrack.

The functionary who receives this wager is the "writer". He may roam the street, making his morning rounds. (This would give rise to the typical observation of currency and white slips of paper changing hands on a street corner.) He may operate from his home or from the home of another. (This would give rise to the typical observation of unusually-heavy pedestrian traffic going

into an apparently private residence for visits of brief duration without obvious legitimate cause.) He may operate from a telephone. He may operate from a bar, a restaurant, a poolroom, a barber shop — either as the ever-present customer or hanger-on or as the bartender, waitress or barber. He may operate as just another employee in a large factory or business office but for his extra-curricular service of collecting the daily wagers from his fellow employees.

A few years ago, the "writer" would accept money from a better and fill out a conventional lottery "ticket" —in duplicate. One copy would go to the better and one would be retained by the "writer." In traditionally keeping one step ahead of not-always-flexible law enforcement and not-always-perceptive judicial interpretation, the conventional lottery "ticket" was several decades ago abandoned for more non-conventional methods of recordation. A better may now simply scribble a three-digit number on any scrap of paper and pass it to his "writer" with the wagered currency. Conversely, the "writer" may be the one to make the notation—again on anything convenient. In some more wary situations, no notation will be made, with the "writer" remembering the number long enough to get to the nearest telephone. Even the wager may be on credit, with no tell-tale exchange of currency.

Typically, however, the "writer" will collect his daily "action"—the wagered currency and the records of the "numbers" bet upon and the amounts wagered on those "numbers"—in ham-sandwiched-sized, two-penny brown paper bags. But however contained, his "action" by early afternoon, must—directly or indirectly—reach the hands of a "pick-up man."

Since most of the reported decisions deal with problems arising out of the convictions of "writers," those decisions offer little precedential guidance in pin-pointing the tell-tale behavioral characteristics of the higher-echelon functionaries in the lottery organization—those who are spared compromising contact with the better and

who are, therefore, vulnerable only to more subtle and patient observation and to more knowledgeable magisterial judgment.

Within the multi-tiered structure, there are frequently variations on the dominant theme. One man may play several roles. In a very small organization, a "writer" may take his "action" directly to an "office" or to the "backer." Conversely, the small "backer" may be serving, during lean years at least, as his own "pick-up man." In the average-sized lottery operation, however, a middle-echelon "pick-up man" will gather the accumulated "action" from a number of "writers" and, in turn, convey the collected "action" to the "office." In an even larger lottery operation, a lesser or greater number of "writers" may turn in their "action" at pre-arranged locations— "drops." The "pick-up man" will then make the rounds of the "drops." A large "writer" may be able to leap-frog the chain of command and go directly to the "office." Some functionaries may combine the roles of "pick-up man" and "writer." Even a "backer" may occasionally "write" for a large, or otherwise personally familiar, better.

Whatever number of echelons are involved, however, the "action" must be "picked up" and conveyed, by hand or by telephone, to an "office" or "turn-in station" before the post time of the first race (generally the fourth, or fifth race at the designated track) which has been selected to yield the first digit of the day's three-digit "number." The "backer" of a lottery operation may be present at the "office" during the busy afternoon hours when the races are being run and when the day's profits and losses are being tabulated. He, more frequently, will isolate himself from the "office" with its bustle of activity and its mass of incriminating evidence. He will likely station himself at some non-incriminating command post, from which he can be in regular telephonic contact with the "office" in order to receive periodic reports as the tabulations are completed. A very large "backer" may have several "offices" — each with its own "office man-

ager" but always in regular telephone communication with the "backer."

Here in the "office", the adding machines tally the "action." They soon ascertain whether there has been dangerously heavy betting on any particular numbers. If there has been, the "backer" will take insurance against heavy losses—"big hits"—by himself betting on those numbers with a "lay-off man" or with some other lottery organization which is willing to take the "lay-off action." A "lay-off man" sits at the very top of the underworld pyramid where, from his position of isolation and security, he serves simply as a high-level lottery "writer" for the lottery "backers" themselves, who need daily insurance against bankrupting "hits" which their own financial resources could not survive. He may also serve as chairman of the Board of Directors of the area's crime lords.

From the known nature of the lottery business, it is clear that one phase of the operation progresses into the next with the ticking of the clock. The "writers" are finishing their daily chores of the morning or of the night before as the "pick-up men" begin their phase of the day's activity. Similarly, the "pick-up" phase is concluded by early afternoon as the "offices" then go to work through the hours of the mid and late afternoon. Equally clear is the fact that only a "writer" generally has contact with betters; that a "pick-up man" is highly mobile, is tied to a rigid timetable and has brief, late morning and early afternoon contact with a series of "writers" or their "drops"; an "office manager" is largely stationary, generally has contact only with the "pick-up men" as they turn in their "action," and remains at the "office" until the last race has been run; and that a "backer" is characterized by greater freedom of movement but by regular telephonic communication with his "office" or "offices."

Measured against this standard, it is clear that there was probable cause for Judge Mitchell to believe—that is, a substantial basis for him to conclude—that the ap-

pellee Joseph Chester Swales was a "pick-up man" and that the two residences involved on this appeal were "drops" along the route of "Pick-up Man Joseph Chester Swales."

Trooper Joseph L. Lawrence began the undercover phase of the present investigation on October 2, 1969, by posing as a customer at Wimbush's Inn, a tavern located on State Route 231 at Bucktown in Charles County. He asked the proprietress, Madeline Wimbush, if she would take his bet in the amount of one dollar on the lottery number 712. This conversation took place at approximately 8 p.m. Madeline Wimbush explained to Trooper Lawrence that it was too late to play a number for that day but that she would accept the bet for the following day. She wrote down the number 712 on a pad and asked Lawrence to place his initials beside the number. She then placed the paper with the lottery number in an area near the cash register.

Trooper Lawrence returned to Wimbush's Inn two months later, on December 2, 1969, at approximately 11:15 a.m. He again discussed the possibility of playing a number with Madeline Wimbush. Mrs. Wimbush explained that he could still get a number in for that day. Trooper Lawrence then played number 712 for one dollar. Mrs. Wimbush accepted the dollar, wrote down the number, and placed the piece of paper in the same area near the cash register.

On December 29, 1969, at approximately 11:30 a.m., Trooper Lawrence entered Wimbush's Inn and again engaged Madeline Wimbush in conversation concerning the purchase of a lottery ticket. Mrs. Wimbush explained that the lottery operation had been suspended for the Christmas holidays and that there would be no more lottery until January 5, 1970.

On January 5, 1970, Trooper Lawrence came to Wimbush's Inn at 12:15 p.m. and attempted to play number 712 with Madeline Wimbush for one dollar. Mrs. Wimbush explained that it was then too late to get the num-

ber in for that day but she accepted the wager for the following day, January 6, 1970.

On January 10, 1970, Trooper Lawrence again placed a one dollar bet with Madeline Wimbush at Wimbush's Inn at 11:00 a.m.

The foregoing observations, recited in the affidavit offered in support of the application for the warrants, made it clear beyond any peradventure of a doubt that Madeline Wimbush was a lottery "writer," accepting bets at her place of business.

Rather than pounce prematurely on a low-level functionary, the State Police, in their wisdom, chose to follow wherever the trail might lead into the labyrinthine interior of the clandestine operation. On the second day of observation, December 2, 1969, the trail led directly to the appellant Joseph Chester Swales. On that day, shortly after placing his one dollar bet with Madeline Wimbush, Trooper Lawrence observed one Charles Eugene Harvey enter Wimbush's Inn at 11:30 a.m. At 12:00 noon, Harvey asked Madeline Wimbush if she knew why Chester was late. Madeline Wimbush stated, "No." At approximately 12:15 p.m. the appellant Joseph Chester Swales drove up in a 1970 Chevrolet, bearing Maryland license JF 8902, which turned out to be registered to him. Harvey immediately left Wimbush's Inn and approached Swales on the parking lot. Harvey was observed to be acting in a very cautious manner as he handed something to Swales, which Swales immediately placed in his pocket. Harvey departed. Swales then entered Wimbush's Inn. Madeline Wimbush then went to the cash register and picked up a piece of white paper, which appeared to be the one on which she had written lottery number 712. She gave the slip of paper and some United States currency to Swales. Swales then counted the currency and placed the items in his pocket. Swales then left Wimbush's Inn within minutes of his arrival and without making any purchase.

This observation alone strongly suggested that the appellant Joseph Chester Swales was the "pick-up man" for

the "writer" Madeline Wimbush. Subsequent observations strongly bore out that indication. On nineteen separate days of surveillance between December 2, 1969, and January 21, 1970, 120 separate observations were made by three separate troopers of a man whom Trooper Lawrence identified directly as the appellant Joseph Chester Swales and whom the other two troopers identified as a Negro male resembling Swales who was observed driving either Swales's automobile or a 1969 Chevrolet, license number EL 4811, listed to one Margaret Mary Swales. On eight separate occasions from December 2, 1969, through January 16, 1970, Swales was observed making stops of between two and eight minutes duration at Wimbush's Inn. He was not observed at Wimbush's Inn on the two occasions when Trooper Lawrence got in his bet too late for that day's activity. On the other hand, he was observed at Wimbush's Inn on the two occasions when Trooper Lawrence got in his bet on time. On both occasions, Swales arrived after the placing of the bet.

The consistent pattern to 111 of the 120 observations was that from the earliest recorded observation of 11:41 a.m. to the latest recorded observation of 3:04 p.m., Swales would visit a total of 19 locations for visits of between one and four minutes in duration and of an average duration of just over two minutes. Throughout the period of automobile surveillance, the State troopers did not attempt to follow too closely Swales through every minute of every day but rather conducted a "loose surveillance." Contact was frequently broken off to avoid the risk of the surveillant being "burned"—that is, discovered by the target of the surveillance.

Illustrating the value of negative observations as well as positive observations in showing significant contrasts, the State troopers conducted a surveillance on Sunday, December 21, 1969, on five spots where Swales would regularly appear. On that particular day of observation, Swales did not appear at all. The affidavit recited the

known fact that lottery operations are not conducted on a Sunday.

In a similarly creative development of negative knowledge, a surveillance was conducted on three of Swales's known spots for daily calls, on December 29, 1969, the day on which Madeline Wimbush indicated to Trooper Lawrence that the lottery operation had been discontinued for the Christmas holidays. Swales did not appear at any of the spots on that day of observation. Conversely, on January 5, 1970, the day which Madeline Wimbush had indicated to Trooper Lawrence would mark the resumption of the lottery business for the new year, Swales was observed at 13 of his regular spots between 12:20 p.m. and 3:04 p.m., for visits ranging between three and eleven minutes in duration and averaging approximately four minutes in duration.

The affiants' observations of direct lottery play were by no means confined to Wimbush's Inn. A second location, where Swales was observed to appear on eight separate occasions between December 12, 1969, and January 16, 1970, for periods of two to five minutes and always between 12:25 and 12:51 p.m., was Medley's Inn, a tavern on Route 247 near Oakville in St. Mary's County. On January 15, 1970, the State troopers entered Medley's Inn at 11:45 a.m. They there observed a Negro female counting lottery slips on top of a bar. When Trooper Lawrence attempted to make closer observations, this female put the lottery slips under the bar and continued to count them.

A third location where Swales was observed to appear on five separate occasions between December 18, 1969, and January 16, 1970, for periods of one to three minutes and always between 1:52 and 2:20 p.m., was the Horseshoe Club, a tavern on Route 235, near Lexington Park in St. Mary's County. On January 15, 1970, the State troopers entered the Horseshoe Club at 11:00 a.m. They there observed three Negro males approach a Negro female, who was sitting in an office and who appeared to

be counting, and give her money and several white sheets of paper.

Yet a fourth location, where Swales was observed to appear on nine separate occasions between December 10, 1969, and January 16, 1970, for periods of three to six minutes and always between 12:08 and 1:45 p.m., was the Starlight Club, a tavern on Route 5 near New Market in St. Mary's County. On January 12, 1970, Troopers Lawrence and Underwood entered the Starlight Club at 1:15 p.m. Trooper Lawrence had conversation with a Negro male who identified himself as Freddie Moreland. Trooper Lawrence observed Moreland turn over to the bartender several slips of paper on which appeared lottery numbers and $41.00 in U.S. currency. The bartender counted the money and placed it under a nickel changer located beside the cash register, along with other slips of paper and U.S. currency. At approximately 1:30 p.m. the appellant Joseph Chester Swales was observed to enter the Starlight Club. The bartender then took the slips of paper and the U.S. currency from under the nickel changer and several additional slips of paper behind the cash register and gave them all to Swales. The bartender then returned to the cash register and counted out $100.00, which he also gave to Swales. Swales took the slips of paper and wrapped them around another large roll of paper that he had taken from his pocket. Swales put the U.S. currency in another pocket and then left the Starlight Club at 1:35 p.m.

During all of the nineteen days of observation covering a period of seven weeks, Swales was never observed to be engaging in any form of legitimate employment.

From the totality of the observations, the conclusion was compelling, let alone permissible, that the appellant Joseph Chester Swales was the "pick-up man" for a lottery operation. The conclusion was equally compelling that seventeen of the nineteen locations whereat Swales would make his regular but brief late morning and early afternoon calls were lottery "drops." The observations concerning his visits to two of the locations would give

rise to the conclusion not that they were "drops" but rather that they were "offices." On three occasions during the week of December 15, 1969, Swales's final stop was a brown brick one-story residence on Route 381 near Ashbox in Prince George's County. On those occasions, Swales remained inside the observed premises for lengthy periods, until 10:30 p.m. on one occasion and until the surveillances were discontinued at 3:15 p.m. and 4:45 p.m. on the other two occasions. During the only observation made during the week of January 5, 1970, the observation of January 5 itself, the last stop of Swales was again at this same brown brick one-story residence. On that occasion, he was still inside when the surveillance was discontinued at 7:30 p.m. On the two days of observation during the week of January 19, 1970, Swales's final stop was at a restaurant at Wilmer's Park on Route 381 near Ashbox, the restaurant being part of the same brick building where Swales had ended up during the weeks of December 15 and January 5. On the first of these two days of observation, January 20, Swales arrived at 3:05 p.m. and was still inside when the surveillance was discontinued at 6 p.m. On the second of these days of observation, January 21, Swales arrived at 2:45 p.m. and was still inside when the surveillance was discontinued at 3:55 p.m. A records check revealed that Arthur William Wilmer, one of the operators of Wilmer's Park, was arrested by the District of Columbia Police Department in 1951 and charged with operating a lottery.

On four days of observation during the week of January 12, 1970, Swales made his final stop at the New Silver Slipper, on the Old Washington Road in Waldorf, Charles County. On the first of these days of observation, January 12, he arrived at 2:23 p.m. and departed at between 4:55 and 5:00 p.m. On the second of these days of observation, January 13, he arrived at 3:24 p.m. and departed at between 5:10 and 5:20 p.m. On the third of these days of observation, January 16, he arrived at 2:39 p.m. and was still inside when the surveillance was discontinued at 4:45 p.m. On the fourth of these days of ob-

servation, January 17, he arrived at 2:40 p.m. and was still inside when the surveillance was discontinued at 5:00 p.m. It is a known characteristic of lottery "offices" — sometimes referred to as "floating offices" — that to hamper detection, they will rotate from one location to another on a weekly basis.

The residence of the appellees Welch and Bowman — referred to throughout the affidavit as "suspected premises no. 8"—was a housetrailer located on Route 235 near Carver Heights in St. Mary's County. Swales was observed to come to this housetrailer on five separate occasions—on December 18, 19, and 20, 1969, and on January 5 and 16, 1970. His times in and out were clocked on four of those occasions. He arrived respectively at 1:45, 1:42, 1:42 and 1:54 p.m. He departed respectively at 1:48, 1:43, 1:45 and 1:58 p.m. He had remained respectively for visits of three minutes, one minute, three minutes and four minutes. Nothing more was observed than the entry and the exit of Swales.

The appellees Welch and Bowman argue strenuously that "unusual numbers of persons entering and leaving the suspected premises" were not observed. To be sure, there were no observations in this regard one way or the other since the surveillance was following the target automobile and not staking out the suspect premises. Nor would one expect a rural "drop" to betray the characteristics of an urban, big-city resort for the "writing" of "numbers." "Numbers" could come into that "drop" by telephone. "Numbers" could have been written earlier that day or even the day or night before by the occupants of that premises or by some third party and then simply "dropped" there for convenient collection by the "pick-up man."

The appellees Welch and Bowman vigorously contend that only these five observations related to their premises and that these five observations, in and of themselves, do not add up to probable cause. They might well be right, if only the five fragments of observation were involved. In evaluating probable cause, however, neither

the issuing magistrate nor the reviewing judge may so narrow his focus to individual fragments as to ignore the pattern of the larger mosaic—to ignore the forest for the trees. Rather do all 131 observations bear upon the probabilities that emerge with respect to the housetrailer of the appellees Welch and Bowman. It is not simply a man who was observed to visit briefly that housetrailer on five occasions. It was a "pick-up man." His visits were of typical "pick-up"-style duration. His visits were in the midst of his daily "pick-up" rounds—preceded by and followed by other obvious "pick-ups" and displaying the same *modus operandi*. To equate "the visits of a man" to "the visits of a known 'pick-up man'" is as fallacious as to equate Hamlet's "Hyperion to a satyr."

The visit of Swales to Welch and Bowman's housetrailer on December 18 was immediately preceded by seven other apparent "pick-ups" of similar style and duration and followed immediately by five other apparent "pick-ups" of similar style and duration. Swales then proceeded to the apparent "office"—"turn-in station" — or "counting house." Swales's visit to Welch and Bowman's housetrailer on December 19 was immediately preceded by seven other apparent "pick-ups" and immediately followed by six other apparent "pick-ups", and ended again at the apparent "office." Swales's visit to Welch and Bowman's housetrailer on December 20 was immediately preceded by three other apparent "pick-ups" and immediately followed by six other apparent "pick-ups", and ended again at the apparent "office." Swales's visit to the housetrailer of Welch and Bowman on January 5 was immediately preceded by six other apparent "pick-ups" and immediately followed by five other apparent "pick-ups", and ended again at the apparent "office." Swales's visit to the housetrailer of Welch and Bowman on January 16 was immediately preceded by three other apparent "pick-ups" and immediately followed by thirteen other apparent "pick-ups", and ended again at the apparent "office." There was clearly a substantial basis for Judge Mitchell to conclude that the housetrailer

of the appellees Welch and Bowman was a "drop" along the route of "Pick-Up Man Joseph Chester Swales."

The same probabilities apply to the residence of the appellees Joseph Chester Swales and Elizabeth Regina Swales — referred to throughout the affidavit as "suspected premises no. 13"—on Route 245 near Hollywood in St. Mary's County. After having left his residence in the morning, Swales was observed to return to his residence on five occasions as part of his early afternoon "pick-up" pattern. Those observations were made on December 18, 19 and 20, 1969, and on January 5 and 16, 1970. His times in and out were clocked on four of those occasions. He arrived respectively at 2:15, 2:10, 2:20 and 2:44 p.m. He departed respectively at 2:20, 2:15, 2:24 and 2:50 p.m. He had remained respectively for visits of five minutes, five minutes, four minutes and six minutes. The visit on December 18 was immediately preceded by eleven other apparent "pick-ups" of similar style and duration and followed immediately by one other apparent "pick-up" of similar style and duration. Swales then proceeded to an apparent "office." The visit of December 19 was immediately preceded by twelve other apparent "pick-ups" and immediately followed by one other apparent "pick-up" which, in turn, was followed by a trip to the apparent "office." The visit of December 20 was immediately preceded by eight other apparent "pick-ups" and followed by one other apparent "pick-up" which, in turn, was followed immediately by a trip to the apparent "office." The visit of January 5 was immediately preceded by ten other apparent "pick-ups" and followed immediately by one other apparent "pick-up" which was, in turn, followed by a trip to the apparent "office." The visit of January 16 was immediately preceded by six other apparent "pick-ups" and followed immediately by nine other apparent "pick-ups" which, in turn, were followed by a trip to the apparent "office."

There would be nothing inconsistent in Swales's residence also serving as one of Swales's "drops." "Numbers" could have been coming in by telephone. The ap-

pellee Elizabeth Regina Swales or any third person could throughout the morning have been "writing numbers" at that location or they could have been "writing" them at some other location and then "dropped" them off for convenient "pick-up." In the case of the residence of Joseph Chester Swales and Elizabeth Regina Swales, there is an added dimension of probable guilt. The demonstrated heavy involvement of Joseph Chester Swales as a "pick-up man" and, further, as one who spent the later afternoon in an apparent "office" or "counting house" would give rise to strong probability that his residence might well contain the cash which would be the "fruits" of his crimes and the lottery paraphernalia which would serve in a tripartite capacity as "contraband," as the "instrumentalities" of his crimes and as "evidence" of his crimes.

In the case at bar, the observations were made by three well-trained and experienced investigators. Trooper Lawrence had been a member of the Maryland State Police for approximately four years and had regularly been assigned to the investigation of lottery violators for nearly two years. In that capacity he had made many investigations and arrests. He had received special training in the investigation of lottery violations and had testified in court on many occasions in connection with those investigations and arrests. Troopers Underwood and Harshman had both been members of the Maryland State Police for approximately two and one-half years, had been regularly assigned to investigate lottery violations for approximately seven months and had received special training in those investigations. As Chief Judge Murphy said for this Court in *Johnson v. State, supra,* at 191-192, "The expertise of the arresting officer in lottery cases is an important factor in assessing the existence of probable cause." See also *Spriggs v. State,* 226 Md. 50; *Le Faivre v. State,* 208 Md. 52; *Chernock v. State,* 203 Md. 147.

Applying their expertise to the observations which they

made and recited in the affidavit, the three State troopers concluded:

> "Your affiants, with their experience, special training, observations and investigation conducted as completely described in this application and affidavit believe that MADELINE WIMBUSH is a Lottery Writer, that she turns her lottery bets and money over to JOSEPH CHESTER SWALES, who is a Pick-Up-Man; that the said SWALES makes regular trips to the aforesaid SUSPECTED PREMISES, using the said 1970 Chevrolet, Md. Reg. GF-8902 for his pick-ups; further that the said SUSPECTED PREMISES #1 thru #19 are places where SWALES picks-up Lottery bets and money; and further that SWALES takes these bets to the said SUSPECTED PREMISES #15 where he meets with other persons for the purpose of Counting and Tallying said bets and money; and further that SWALES activities are not consistant with normal visitations, but are consistant with the operation of a Lottery scheme known as "NUMBERS"; and further that the said SUSPECTED PREMISES #16, 17, 18, and 19 are also places where Swales picks-up Lottery bets and money; and further that the said SUSPECTED PREMISES #15-A is also being used by Swales and others for the purpose of Counting and Tallying said bets and money; and your affiants aver there is probable cause to believe, and they do believe that the aforesaid persons, places and vehicles, as completely described, are violating the said Gambling Laws."

Judge Mitchell concurred in that conclusion and decided that probable cause existed to justify the issuance of the warrants here in question. We hold that he was right in that judgment.

Indeed, to hold otherwise would be to strike a frus-

90

trating and unnecessary blow at the type of diligent and painstaking investigation which should, in all events, be encouraged.

*The orders dismissing the indictments are reversed; cases remanded for further proceedings.*