## STATE OF MARYLAND *v.* LAWRENCE H. LOHSS

[No. 231, September Term, 1973.]

\* \* \*

## STATE OF MARYLAND *v.* DONALD M. SPRENKLE

[No. 386, September Term, 1973.]

*Decided December 28, 1973.*

490

The cause was argued before ORTH, C. J., and MORTON and GILBERT, JJ.

In Nos. 231 and 386, *James G. Klair, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Raymond G. Thieme, Jr., State's Attorney for Anne Arundel County,* and *Gerald K. Anders, Assistant State's Attorney for Anne Arundel County,* on the brief, for appellant.

In No. 231, *Joseph H. Rouse* for appellee Lawrence H. Lohss.

In No. 386, *Theodore G. Bloom,* with whom were *Albert J. Goodman* and *Goodman & Bloom* on the brief, for appellee Donald M. Sprenkle.

ORTH, C. J., delivered the opinion of the Court.

The threshold question presented by these appeals is whether this Court has jurisdiction to hear them.[1]

LAWRENCE H. LOHSS and DONALD M. SPRENKLE were jointly indicted, charged with violations of the controlled dangerous substances law. The indictment was dismissed as to each of them prior to trial on the merits because the State could not prove the charges presented without evidence which was excluded upon grant by the court below of motions to suppress property obtained by a search and seizure found to have been unlawful. The order dismissing the indictment as to Lohss was issued by Evans,

1. State v. Lohss, No. 231, September Term, 1973, and State v. Sprenkle, No. 386, September Term, 1973, were consolidated by order of this Court of 21 August 1973.

492

J. on 20 March 1973 upon written motion of Lohss. In the record is a pencil notation on a pad-size sheet of paper bearing the printed name of Judge Evans: "Mr. Anders [Assistant State's Attorney] concedes; no objection to order." The order dismissing the indictment as to Sprenkle was issued by Wray, J. on 27 June 1973 upon written motion of the State. Judge Wray noted on the motion on that date: "I have earlier talked with Mr. Bloom [defense counsel]. He has no objection to grant of Motion."

I

In Maryland appellate jurisdiction is at the largess of the General Assembly. A state is not required by the federal constitution to provide the right of appellate review. *Griffin v. Illinois*, 351 U. S. 12, 18; *Harris v. State*, 6 Md. App. 7, 17.[2] The Constitution of Maryland, however, established a Court of Appeals; by amendment it permits the statutory creation of intermediate courts of appeal and their appellate jurisdiction. Constitution of Maryland, Art. IV, §§ 14 and 14 A. By virtue of this authority the General Assembly created the Court of Special Appeals, Code, Art. 26, § 130, and from time to time has allocated jurisdiction between the two appellate courts. See Code, Art. 5, §§ 5 A-5 D.

By Acts 1957, Ch. 399, § 4, the General Assembly repealed Art. 5 of the Code, entitled "Appeals and Errors" and enacted a new Art. 5 in lieu thereof, entitled "Appeals". In § 14 of the new Article 5 it prescribed the right of appeal by the State. Section 14, as amended by Acts 1966, Ch. 12, § 1,[3] reads:

"The State may appeal to the Court of Special Appeals from a final order or judgment granting a motion to dismiss, or quashing or dismissing any indictment, information, presentment or inquisi-

2. When the right is given by a state, however, a person is protected from invidious discriminations with respect thereto or from improper denials thereof by the due process and equal protection clauses of the federal constitution flowing to the states through the fourteenth amendment. See *McCoy v. Warden*, 1 Md. App. 108, 121.
3. The amendment substituted "Court of Special Appeals" for "Court of Appeals."

tion in a criminal action, but the State shall have no right of appeal in any criminal action where the defendant has been tried and acquitted."

We have declared that the statute means precisely what it says. *State v. Simms*, 13 Md. App. 203, 205, citing *State v. Hunter*, 10 Md. App. 300. What it says, loud and clear, is that the State is given the right to initiate and perfect, and the Court of Special Appeals is given jurisdiction over, an appeal from a final order or judgment granting a motion to dismiss or dismissing an indictment.[4] The plain legislative intent is that the State may appeal to this Court from the dismissal of an indictment irrespective of the reasons motivating such dismissal, the only limitation being where the accused has been tried and acquitted. So, in *Hunter*, at 307, we found "* * * no intention on the part of the Legislature to restrict the State's right of appeal to cases where the dismissal was based on the legal insufficiency of the indictment." Recognition of this view is manifest in the appeals entertained by the Court of Appeals and this Court. Orders have been reviewed which dismissed indictments on the grounds of denial of a speedy trial,[5] violation of the guarantee against double jeopardy,[6] lack of prosecution,[7] and failure to provide a preliminary hearing.[8] We see nothing in the unambiguous language of the statute to indicate that the Legislature intended to exclude from the

---

**4.** Defenses and objections raised before trial shall be raised by motion to dismiss or to grant appropriate relief. Demurrers and motions to quash are abolished. Maryland Rule 725.

A trial for a criminal offense shall be held only on indictment. Rule 703. For the meaning of "indictment" see Rule 702 a as amended effective 1 June 1972 and 1 July 1973, and Maryland District Rules 702 a, 702 c and 706.

The dismissal of an indictment is patently a final judgment. In the absence of review the case is concluded and the accused is released. *State v. Hodges*, 55 Md. 127, 134.

**5.** *State v. Jones*, 18 Md. App. 11; *State v. Dubose*, 17 Md. App. 292; *State v. Hunter*, 16 Md. App. 306; *State v. Hamilton*, 14 Md. App. 582; *State v. Williams*, 6 Md. App. 5, *cert. den.*, 254 Md. 720; *State v. Long and Nelson*, 1 Md. App. 326, *cert. den.*, 247 Md. 740, 390 U. S. 983. See *Harris v. State*, 194 Md. 288.

**6.** *State v. Barger*, 242 Md. 616. See *State v. Campbell*, 7 Md. App. 538, n. 3 at 542.

**7.** *State v. Hunter, supra.*

**8.** *State v. Simms, supra.*

right of the State to appeal from any order dismissing an indictment, an order in which the dismissal was predicated upon the grant of a motion to suppress evidence. On the contrary, we have, in the past, accepted that we have jurisdiction to hear such appeals and entertained them. See, for example, *State v. Graziano,* 17 Md. App. 276; *State v. Lee,* 16 Md. App. 296; *State v. Siegel,* 13 Md. App. 444; *State v. Swales,* 12 Md. App. 69.

We do not think that the jurisdiction of this Court is affected by who initiates the order of dismissal. The statute does not limit the State's right to appeal to dismissals of indictments not at its instance. The dismissal is at the sound discretion of the trial court, and whether the dismissal is suggested or proposed or urged or formally moved by the accused or by the State, or is accomplished by the *sua sponte* action of the court is not material to our jurisdiction or to the State's right to appeal. As we have indicated, the statute flatly gives the State the right to appeal "from a final order or judgment granting a motion to dismiss, or quashing or dismissing any indictment", the *only* exception being where "the defendant has been tried and acquitted." We adhere to our expressed belief that the statute means precisely what it says.

We hold that the appeals here are within our jurisdiction.[9]

## II

The general rule is firmly established that appeals from interlocutory orders of the trial court in a criminal case are not allowed, the principle being that they are premature until after final judgment. Code, Art. 5, § 12; Rule 1035; *Raimondi v. State,* 8 Md. App. 468, 470. See *Powers v. State,* 8 Md. App. 487; *Davis v. State,* 8 Md. App. 480; *Dodson v. State,* 8 Md. App. 478; *Pearce v. State,* 8 Md. App. 477. Compare *Westmoreland v. State,* 8 Md. App. 482; *Brown v.*

---

**9.** We denied a motion made by Sprenkle prior to argument, but not within 10 days from the date the record was filed, to dismiss the appeal as to him. At oral argument Lohss asked that we dismiss the appeal as to him *sua sponte,* for the reasons advanced by Sprenkle. Construing the brief of each appellee as moving a dismissal of the appeal, we deny the motion as to each appellee. See Rule 1036.

*State,* 2 Md. App. 388. The grant of a motion to suppress evidence, standing alone, is an interlocutory order and not appealable. *State v. Mather,* 7 Md. App. 549.[10] But when a final judgment is attained by the dismissal of the indictment, the propriety of the motion to suppress is open to review by this Court upon appeal of the dismissal of the indictment by the State. Rule 1087 provides:

> "On an appeal from a final judgment, every interlocutory order which has previously been entered in the action shall be open to review by this Court unless an appeal has theretofore been taken from such interlocutory order and has been decided on the merits by this Court."

We hold that the order of the Circuit Court for Anne Arundel County entered 27 February 1973 granting the motion by Lohss and the motion by Sprenkle to suppress evidence claimed to have been obtained by an unlawful search and seizure is open to review by this Court, upon dismissal of the indictment.

We are not persuaded to the contrary by the argument of

---

**10.** We declared in *Mather* at 554: "Under the present law of Maryland * * * the State has no right to appeal, either by statute, by rule, or under the common law, from the granting of a motion to suppress evidence."

As to a statute, we thought it plain that Code, Art. 5, § 14, limited the scope of the State's right to appeal to final orders or judgments granting a motion to dismiss an indictment. 7 Md. App. at 552. We also decided that the "inquisition in a criminal action" mentioned in § 14 provided no basis to authorize the State to appeal from the granting of a motion to suppress evidence. At 553. And see concurring opinion of Orth, J. at 555-558. As to a rule, we pointed out that Md. Rule 729 provides for appellate review when a motion to suppress is denied, but not when such motion is granted. We observed, after recognizing the rule that an appeal in a criminal case is premature until after final judgment, that the granting of such a motion was no more final than would be any other ruling excluding testimony at a trial. 7 Md. App. at 551-552. As to the common law, we considered and rejected an argument by the State that as the common law gave it the right to seek appellate review by writ of error of a judgment in a criminal case sustaining a demurrer to or quashing an indictment, and as the effect of the granting of a motion to suppress evidence was to strip the State of its evidence and render it powerless to proceed to trial, the granting of such a motion was tantamount to sustaining a demurrer to the indictment, and, therefore, appealable. We pointed out that this argument was flatly rejected in *State v. Adams,* 196 Md. 341 and *State v. Barshack,* 197 Md. 543, decided prior to the enactment of § 14. We further noted that, even assuming we had authority to issue a writ of prohibition, it was not the function of that writ to review proceedings. At 554.

appellees that the State is accomplishing through the dismissal of the indictment an appellate review of the motion to suppress otherwise not available to it. We have found that such review in the circumstances is authorized by statute, rule and judicial decision.[11] It is true that the Court of Appeals and this Court have said that if the denial of a motion to suppress evidence is to be appealable, it must be granted by the Legislature. *State v. Adams,* 196 Md. 341, 351; *State v. Barshack,* 197 Md. 543, 545; *State v. Mather, supra,* at 554. But the statement was made in the frame of reference of an appeal from an interlocutory order standing alone.[12] Although the Legislature has not responded by bestowing the right of appeal to an interlocutory order, standing alone, which grants a motion to suppress the evidence, it has evidenced its satisfaction with the present status of the law, permitting review of the interlocutory order after final judgment, by not changing it.

## III

A motion to suppress evidence on the ground that it was obtained by an unlawful search and seizure was filed by Sprenkle on 18 December 1972 and by Lohss on 13 January 1973. Rule 729 b 1. A plenary hearing on the consolidated motions was had on 18 January. Rule 729 d 1.[13] They were granted by order entered 27 February.

At the hearing testimony was received from Sprenkle, Lohss, Robert D. Housley, the City Manager for Texas International Airlines in Austin, Texas, employed by the company for eleven years, and two police officers, Corporal

---

11. We observe that an accused is not afforded an appellate review of a denial of a motion to suppress evidence until final judgment, that is, conviction and sentence. See Rule 729. Just as the accused may challenge the correctness of the denial of his motion to suppress in appellate proceedings following his conviction, the State may challenge a grant of the motion following a dismissal of the indictment; in each case a final judgment has then been rendered.

12. The Legislature has provided for appeal from certain interlocutory orders of courts of law, Code, Art. 5, § 1A, and courts of equity, Code, Art. 5, § 7.

13. As to whether a motion to suppress evidence is to be determined as a preliminary matter or during trial, see *Taylor v. State,* 19 Md. App. 386, construing Rule 729 d.

Warren Pitt and Trooper Wayne A. Peret of the Maryland State Police, Narcotics Section. The events leading to the seizure of the challenged evidence was undisputed in substantial part. On 31 August 1972 Sprenkle booked passage on a chartered plane from Robert Mueller Airport in Austin, Texas to Dallas, Texas. He checked his baggage, consisting of three suitcases, two large and one small, about 5:35 p.m. central standard time through to his ultimate destination, Friendship International Airport in Maryland. Warren B. Hewgley, the Customer Service Agent for Texas International whose duties at times included assisting in loading and unloading the planes, while processing Sprenkle's baggage noticed a strong odor of marijuana. He reported to Housley. "He came to my office and said we have a suitcase out here that smells very much like marijuana and he asked me to smell his hands and * * * the smell was all over his hands. * * * He asked me to come out and inspect it." The suitcase was opened. It contained a plastic garbage type bag and the odor of marijuana was very strong. " [T]he smell would knock you down." Housley had seen and smelled marijuana fifteen or twenty times before in the course of his work. "I've seen it in small plastic, I would estimate, around one pound bags, plastic, I've seen it loose in the bag, I've seen it in clothing, I've seen it in milk cartons, I've seen it rolled up in tin foil, kitchen wrap, I've seen it wrapped up in newspapers." From these contacts with the substance and from public displays of it, (apparently for educational purposes), he was familiar not only with its appearance but its odor. The suitcase he examined had been checked by Sprenkle.[14] The Sheriff's office was called and the matter reported. By the time a deputy sheriff arrived, the plane, carrying Sprenkle and his baggage had left.[15] The deputy sheriff called the Department

---

**14.** Housley explained "how we can actually tell whose bags belong to who." He said: "As we check the passengers in at our counter the bags are put on a conveyor belt and they have a number on the ticket which they keep in their possession to claim their luggage at their final destination plus we have a transfer manifest which coincides with the passenger ticket and on this date we kept a copy of the baggage tickets." The three suitcases Sprenkle checked were given numbers 364753, 364754 and 364755.

**15.** Housley examined Sprenkle's suitcase less than 10 minutes before the

of Public Safety in Austin and had them call a law enforcement agency in Dallas where Sprenkle would change to an American Airline plane to proceed to Maryland.[16]

About 7:50 p.m., eastern standard time, the Maryland State Police received a teletype from the Department of Public Safety, Austin, Texas. Peret picked up the teletype at 8:10 p.m. It read:

"THIS OFFICE RECEIVED INFORMATION FROM BOB HOUSLEY WITH THE TEXAS INTERNATIONAL AIRLINES OFFICE IN AUSTIN, TEXAS THAT A PASSENGER GOING BY NAME OF D. SPRINKLE PASSED THROUGH THE AUSTIN MUNICIPAL AIRPORT AND PURCHASED 1st CLASS TICKET FOR BALTIMORE ON TEXAS INTERNATIONAL FLIGHT 968 TO DALLAS AND AMERICAN AIRLINE FLIGHT 324 DUE TO ARRIVE BALTIMORE AIRPORT AT 1125 PM YOUR TIME TONIGHT. THIS SUBJECT HAD 3 SUITCASES BELIEVED CONTAINING 30 LBS OF MARIJUANA. BAGGAGE CHECK NBRS WILL BE 364753, 364754 and 364755. TWO BAGS WILL BE BLUE IN COLOR AND ONE BAG WILL BE TAN IN COLOR. IT IS REQUESTED THAT YOU ATTEMPT TO APPREHEND BOTH THE PASSENGER AND SUBSTANCE AT FINAL DESTINATION YOUR CITY. OFFICIALS IN DALLAS HAVE BEEN NOTIFIED AND THEY WILL ATTEMPT TO MARK THIS BAGGAGE WHILE IN TRANSIENT. ADVISE THIS OFFICE WHEN AND IF APPREHENSION IS MADE."

Peret and Pitt, with whom he was working on the case, desired to talk to Housley. Unable to reach him they

---

plane was scheduled to depart. He said: "We may have delayed the flight two or three minutes waiting on the police, but we don't feel that we can cause seventy-five to a hundred people misconnect a flight to delay one, therefore they were sent on."

16. The record does not disclose what attempt, if any, was made to intercept the baggage in Dallas.

requested he call back. He did so at 9:00 p.m. It is clear from the testimony of Housley, Peret and Pitt that Housley recounted to the officers everything that had occurred.[17]

Peret, Pitt and other officers went to Friendship Airport. They were informed by American Airlines that "a Sprenkle, D. Sprenkle boarded the plane on 31 August, he went from Austin to Dallas and he was on the flight from Dallas to Baltimore and the flight was running late." Shortly thereafter a second teletype was received from the Texas authorities:

"REFER 3371 TXDPS000 8-31-72
IT HAS BEEN CONFIRMED THAT D. SPRINKLE DID BOARD AMERICAN FLIGHT 324 IN DALLAS AND THE THREE BAGS MENTIONED ARE ALSO ON BOARD. SUBJ D. SPRINKLE IS DESCRIBED AS WHITE MALE IN HIS TWENTIES 5-8 TO 5-10 160 to 165 LONG SANDY BLONDE HAIR DOWN TO HIS SHOULDERS WITH BEARD. SUBJ WEARING MULTI-COLORED T-SHIRT WITH BUTTER FLOWER ON FRONT, BLUE JEANS AND SUNSHADES — MIRROR TYPE. SUBJ ALSO WEARING EXPENSIVE RING AND WAS OBSERVED FLASHING LARGE ROLL OF MONEY AROUND AT THE DALLAS AIRPORT BY PLAINCLOTHES OFFICER. HA'/E RE-

---

**17.** Peret testified: "He advised that at approximately 5:35 p.m. his state, Texas time, two blue suitcases and one tan suitcase came through the baggage chute at the airlines. The suitcases were first noticed by Mr. Warren Hewgley. He's an agent for the airlines. He noticed a strong and unusual odor about the suitcases. He asked Mr. Housley to come over and examine the suitcases. Mr. Housley advised us that he recognized the smell, he cracked open the suitcase and recognized the smell to be marijuana. He further advised us that he has had previous experience in the identification in the odor of marijuana, and through previous experience recognized the contents or recognized the odor to be marijuana. He also advised us he assisted the police departments in many other investigations of this kind. * * * Also he advised that he had a right to open the luggage under the CAB regulations and this was one of his duties as City Manager." Pitt added that Housley also gave them the baggage claim numbers. Housley summed up what he told the officers: "Number of bags, what we had suspected in one of the bags, bag checks, the passenger itinerary, his final destination." He also gave them a description of Sprenkle.

500

CEIVED REPORT THAT SUBJ MAY HAVE AS MUCH AS 100 LBS OF MARIJUANA IN HIS BAGGAGE RATHER THAN 30 THAT WAS REPORTED IN LAST MESSAGE. REQUEST YOU SEND US A FOLLOW-UP REPORT ON THIS CASE AS TO DISPOSITION. ALSO PLEASE ACKNOWLEDGE RECEIPT OF THIS MESSAGE.
COMMUNICATIONS
TEXAS DPS AUSTIN MARK 31 2108 CDT"

Informed that flight #324 with Sprenkle aboard would arrive about 11:48 p.m., the police arranged a stake-out. The plane came in and Sprenkle debarked. Peret testified: "His description given in the teletype was perfect. * * * He matched the teletype except for the mirror glasses." Peret made a judicial identification of Sprenkle as the man who fit the description. Sprenkle met a man, subsequently determined to be Lohss, who was accompanied by a woman and a child. Sprenkle and Lohss went to the baggage area and awaited the baggage at a point where luggage "comes onto the conveyor belt." Lohss picked up a tan suitcase and a blue suitcase. Sprenkle picked up a small blue suitcase. They walked toward the exit. Peret accosted Sprenkle, identified himself as a police officer, and "made a quick check" of the baggage claim number on the suitcase carried by Sprenkle. It matched the number in the teletype. Peret arrested Sprenkle. Lohss "hurried for the exit but was stopped by Corporal Pitt." Pitt testified that upon Sprenkle's apprehension Lohss "proceeded to head in the direction of the exit in a very quick manner." He explained: "Well, prior to the time of the identity of Trooper Peret and the approach of Trooper Suttle and myself and the other officers in the area they were walking at a normal rate. After Trooper Peret identified himself as a State Police officer where the majority of the people in the immediate area could hear that's when Mr. Lohss proceeded to walk in a very fast pace." Pitt approached Lohss, and observed that the baggage claim checks on the suitcases he was carrying were identical to the ones received on the teletype and from Housley. He arrested Lohss.

The police seized the suitcases and took them and Sprenkle and Lohss to the airport police office, which apparently consisted of two small adjoining rooms. The suitcases were in one room and Sprenkle and Lohss in the other, but within "visual range" of the suitcases through an open door. The suitcases were opened and the property found therein, which was subsequently the subject of the motions to suppress, was seized.[18]

## IV

The hearing judge in granting the motions to suppress the evidence, assumed, although noting some doubt, that the arrests were legal. He thought, however, that the police were required to obtain a warrant to search the suitcases. He said in an opinion filed 27 February 1973: "It is elementary that searches are constitutionally 'unreasonable' if done without a warrant if there is time to get a warrant. The only on-the-spot searches the United States Supreme Court has approved are those of vehicles [he noted: 'Aside from a search of the person for weapons or contraband.'], this on the theory that they are self-propelled and unlikely to remain if time is taken to get a warrant. No such exigent circumstances appear here. The suitcases were in police custody and were not self-propelled. If the police were afraid that they contained weapons, they did not mention it in testimony, or explain how the Defendants would get to them." We do not see it that way.

Even if Housley was without authority to open Sprenkle's suitcase, there was no violation of the Fourth Amendment guarantee against unreasonable searches thereby. " [B]y

---

**18.** The transcript of the proceedings at the hearing does not disclose precisely what was seized or from what suitcases. The basis of the charges against Sprenkle and Lohss from the allegations in the indictment returned against them is the possession of marijuana. Lohss's motion to suppress asserts that "all of the incriminating evidence against [him] was obtained as a result of his unlawful arrest and the unlawful search of him and the illegal and unlawful seizures resulting from said arrest and searches." Sprenkle's motion to suppress makes clear that the challenged evidence was obtained from his baggage. "The tangible objects found inside movant's baggage and seized therefrom are not admissible in evidence because they were obtained as a result of said unlawful and unconstitutional seizures and searches." Argument of counsel at the hearing also so indicates.

history, judicial rule and application, the exclusionary rule as to evidence seized in violation of the Fourth Amendment comes into play only when the evidence is obtained by governmental action." *Herbert v. State*, 10 Md. App. 279, 284. It is clear from the evidence that neither Housley nor the employee he supervised was associated with enforcement authorities in any way.[19] Therefore, there was no constitutional impediment in the manner in which Housley came by the information he imparted first to the local sheriff and later directly to the Maryland State Police.

The ultimate determination of the reasonableness of the seizure of the challenged evidence rests upon the probable cause for the warrantless arrest of Sprenkle and Lohss. A basis of that probable cause was the hearsay information from Housley. The two-pronged test of *Aguilar v. Texas*, 378 U. S. 108 established constitutional guidelines for measuring hearsay information in a probable cause setting. "The 'basis of knowledge' prong requires of him who would act upon hearsay, a knowledge 'of some of the underlying circumstances' upon which the informant based his conclusion. The 'veracity' prong is in the alternative. It requires of him who would act upon the hearsay, a knowledge of 'some of the underlying circumstances' which leads to the conclusion that the informant is 1) 'credible or 2) his information reliable.'" *Thompson v. State*, 16 Md. App. 560, 562.

We have not the slightest difficulty in concluding that the requirements of *Aguilar's* two prong test were met. We said in *King and Mobley v. State*, 16 Md. App. 546, 554-555:

> " [T]he strictures of *Aguilar v. Texas*, 378 U. S. 108, and *Spinelli v. United States*, 393 U. S. 410, 'are aimed primarily at unnamed police 'informers'

---

**19.** Housley testified that as the Austin Manager of Texas International Airlines, for which he had worked for eleven years, he was not part of any governmental unit or governmental agency, that he had never worked for any governmental agency or been employed by any governmental agency or received any fees or compensation from any governmental agency. He further testified that Hewgley was not "employed by any governmental unit of any kind." There is no suggestion that the inspection of Sprenkle's luggage by Housley and Hewgley was initiated in any way by the police or other governmental agents.

"rather than at that broad class of secondary sources who are the victims of crime, the disinterested witnesses of crime, other disinterested civilian sources of information or other law enforcement officers. The members of this broad class are generally, but not universally, named. They are not from the criminal milieu."

The Court of Appeals quoted this statement with complete approval in affirming our decision in that case, *Mobley and King v. State,* 270 Md. 76, declaring its full agreement with our view that a different rationale exists for establishing the reliability of citizen-informers than for establishing that of the more suspect and anonymous police informer. Housley was named. He fell into that broad class of secondary sources. We said in *Dawson v. State,* 11 Md. App. 694, 699:

"The practical distinction is that in dealing with a named source, the very naming of the source and the relationship of the source to the observed information may go a long way (or even be sufficient unto itself), under the facts of a particular case, to establish the credibility of that source or the reliability of his information. *Kapler v. State,* 194 Md. 580; *Ward v. State,* 9 Md. App. 583, 591-592; *Grimm v. State,* 6 Md. App. 321, 328. See also *Taylor v. State,* 238 Md. 424; *Jones v. State,* 242 Md. 95; *Knight v. State,* 7 Md. App. 282."

See also cases cited in the concurring opinion of Moylan, J. in *Dawson v. State,* 14 Md. App. 18, 34, n. 9. Housley based his conclusion that Sprenkle's baggage contained marijuana on his own personal observations backed by his past experience. All of this was made known to the arresting officers by him directly. The information the police team secured from Housley clearly gave them probable cause for the warrantless arrests.[20] Code, Art. 27, § 594 B (d) provides:

---

**20.** "The rule of probable cause is a non-technical conception of a reasonable ground for belief of guilt, requiring less evidence for such belief than would justify conviction, but more evidence than that which would arouse a mere suspicion. * * * '[O]nly the probability, and not a prima facie

"A police officer may arrest a person without a warrant if he has probable cause to believe:

(1) That an offense listed in subsection (e) of this section has been committed, and

(2) That the person has committed such offense, and

(3) That unless the person is immediately arrested,

(i) He may not be apprehended, or

(ii) He may cause injury to the person or damage to the property of one or more other persons, or

(iii) He may tamper with, dispose of, or destroy evidence."

Subsection (e) (ix) designates "Sections 276 through 313 D (relating to drugs and other dangerous substances) as they shall be amended from time to time." See also Code, Art. 27, § 298 (e). In the circumstances here existent, the statute patently authorized the arrest of Sprenkle and of Lohss. And see *Draper v. United States*, 358 U. S. 307, which we believe to be so factually comparable in substance as to be indistinguishable. We hold that the arrest of Sprenkle and the arrest of Lohss were legal.

The arrests being legal, a substantially contemporaneous search and seizure incident thereto was reasonable. *Brown*

---

showing, of criminal activity is the standard of probable cause. * * *.' Of course, whether probable cause is shown to exist may be measured in terms of the collective information demonstrated by the record to be within the possession of the entire police team. * * *." (Citations omitted) *Mobley and King v. State*, 270 Md. 76.

With regard to Lohss, we point out that we are not now concerned with his guilt *vel non* of the crimes charged, but only whether the officers had probable cause to arrest him. Whether he was innocently caught in a web not of his own spinning, or whether he was guilty as charged, is not the issue before us. He testified that he was at home and "there were several people downstairs and someone just said Donald was coming into the airport and I had the car and I should pick him up * * * I should go and pick him up because I was the only one who had a car, I lived in a house with fourteen people." Such evidence was not relevant to the validity of his arrest. He admitted he went to the airport, met Sprenkle and helped with Sprenkle's baggage, although he claimed he carried only one suitcase. What is pertinent is what the arresting officers had probable cause to believe at the time of the arrest.

*v. State,* 15 Md. App. 584.[21] "When a man is legally arrested for an offense, whatever is found upon his person or in his control which is unlawful for him to have, and which may be used to prove the offense, may be seized and held as evidence in the prosecution." *Carroll v. United States,* 267 U. S. 132, 158 as quoted in *Brown* at 590. See *Scott v. State,* 7 Md. App. 505. The suitcases were in the control of Sprenkle and Lohss when they were arrested and were thus subject to search. We think that the search which followed was substantially contemporaneous with the arrests. The search of the suitcases was delayed after the arrests only so long as was necessary to take the arrestees to a place where it would be feasible to conduct the search. We do not believe that constitutional reasonableness required that the officers immediately open the suitcases on the floor of the public airport baggage room and search them. The right to seize and search the suitcases accrued at the time of the lawful arrests. It was not divested in the circumstances by the short time which elapsed before the right was exercised.

In this case, moreover, the State troopers already had ample probable cause to believe that the suitcases contained contraband marijuana. The police were simply seizing what they already knew to be probable evidence, albeit the evidence was inside the suitcases. At the moment of seizure, the suitcases were still in the hands of the arrestees and therefore pre-eminently within the perimeter drawn by *Chimel v. California,* 395 U. S. 752, around the person of an arrestee.

We hold that the seizure of the challenged evidence did not violate the Fourth Amendment guarantee against unreasonable searches and seizures.[22]

As to each appellant, the order suppressing the evidence

---

**21.** *Brown,* although primarily concerned with the "Plain View Doctrine", traces the history and development of the common law right to search an arrestee as an incident of lawful arrest.

**22.** Sprenkle points out that at argument on the motion to suppress the State said that "this is not a search incident to an arrest, the State disclaims that." We are not bound by this disclaimer.

506

and the order dismissing the indictment is reversed and the case remanded for further proceedings.

> *As to Lawrence H. Lohss, Appeal No. 231: motion to dismiss appeal denied; Order of 27 February 1973 suppressing evidence reversed; Order of 20 March 1973 dismissing indictment reversed; case remanded for further proceedings; costs to be paid by Lawrence H. Lohss; mandate to issue forthwith.*
>
> *As to Donald M. Sprenkle, Appeal No. 386: motion to dismiss appeal denied; Order of 27 February 1973 suppressing evidence reversed; Order of 27 June 1973 dismissing indictment reversed; case remanded for further proceedings; costs to be paid by Donald M. Sprenkle; mandate to issue forthwith.*