921 A.2d 334

**STATE of Maryland**

v.

**Cindi Renee Katherine RUSH.**

**No. 2007, Sept. Term, 2006.**

Court of Special Appeals of Maryland.

April 27, 2007.

Diane E. Keller (Douglas F. Gansler, Attorney General, on brief), Baltimore, MD, for Appellant.

David A. Martella, Rockville, MD, for Appellee.

Panel: DEBORAH S. EYLER, WOODWARD, JOHN F. McAULIFFE, (Ret'd, Specially Assigned), JJ.

DEBORAH S. EYLER, J.

In its murder prosecution against Cindi Renee Katherine Rush, the State has appealed a pre-trial ruling by the Circuit

Court for Prince George's County suppressing from evidence inculpatory statements Rush gave to the police. The State asks whether the circuit court erred in ruling that the statements were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Rush maintains that the *Miranda* ruling was correct but asks, beyond that, whether the suppression ruling should be upheld because, contrary to the alternative ruling of the circuit court, her statements were not voluntarily made.

For the reasons that follow, we hold that 1) in the circumstances of this interrogation, there was no *Miranda* violation; 2) this Court has jurisdiction to decide Rush's alternative involuntariness argument; and 3) some of Rush's statements to the police were not voluntarily given. Accordingly, we shall affirm the circuit court's suppression ruling in part, although on an alternative ground, vacate it in part, and remand the case for further proceedings.

## FACTS AND PROCEEDINGS

Rush stands charged with the first degree murder of Patricia Caniglia, first degree assault of Antonio Caniglia, and other related offenses. The underlying events took place on April 19, 2006.

That evening, at about 7:30, Mrs. Caniglia and her adult son Antonio were inside their home in the Fort Washington area of Prince George's County. An assailant armed with a handgun broke into the house, confronted Mrs. Caniglia in an upstairs bedroom, and shot her in the head, killing her. Antonio was in the basement when the intruder entered. When he heard his mother cry out, he armed himself with a shotgun and confronted the intruder, who aimed the handgun at him. Antonio shot the intruder, killing him. The intruder, who was a stranger to the Caniglias, later was identified as one Jeffrey Gilbert, nicknamed "DC".

That same night, at the time of the shooting, a witness noticed a red car parked in front of the Caniglia house. The car was occupied by a man and a woman, both of whom were

slouching down, as if to avoid being seen. The woman was about 20 years old, Caucasian, with black hair.

Prince George's County Police Department ("PGCPD") officers investigating Mrs. Caniglia's murder became interested in Rush as a suspect once they obtained Gilbert's cell phone records. From those records, the police learned that Rush, Gilbert, and another suspect, Larry Ellis (nicknamed "JR"), were together and in the immediate area of the Caniglia home when the shooting happened. The police investigation further disclosed that, a few years before the shooting, Rush had worked at the Caniglia family's restaurant and had been romantically involved with Antonio. Indeed, for some period of time, Rush had lived with the Caniglias. Also, Rush matched the witness's physical description of the woman in the red car.

In the District Court of Maryland for Prince George's County, Detective Kerry Jernigan, the lead homicide detective on the Caniglia case, filed an application for statement of charges against Rush. On the basis of the information in the application, Rush was charged with first-degree murder of Mrs. Caniglia, and an arrest warrant was issued for her.

On May 1, 2006, Corporal William Chinn and other officers in the PGCPD's Homicide Unit arrested Rush on the warrant, at her aunt's home in Baltimore County. They transported her to the unit's Criminal Investigation Division, in Upper Marlboro. There, Rush signed an Advice of Rights Form and was interrogated by Detective Jernigan. The interrogation was digitally recorded and saved on a DVD.

After initially saying that she had had nothing to do with the murder, Rush made several inculpatory statements, at first oral and then in writing.

On May 30, 2006, in the Circuit Court for Prince George's County, a grand jury indicted Rush for first-degree murder of Patricia Caniglia, armed robbery of Antonio Caniglia, and other related charges. Rush filed a timely motion to suppress from evidence the inculpatory statements she made to Detective Jernigan.

The circuit court held a suppression hearing on September 27, 2006. Detective Jernigan and Corporal Chinn testified in the State's case-in-chief; Rush testified on her own behalf; and Detective Jernigan testified on rebuttal. The DVD of the interrogation, the Advice of Rights Form, the Application for Statement of Charges, and Rush's written statement were moved into evidence as State's exhibits. The defense did not offer any exhibits. The issues before the court were whether Rush's statements were obtained in violation of *Miranda* and whether her statements were made voluntarily, under the standards imposed by federal constitutional, Maryland constitutional, and Maryland non-constitutional law.

After hearing closing arguments of counsel, the circuit court ruled that Rush's statements had been obtained in violation of the dictates of *Miranda,* and would be suppressed on that ground. The court made plain that it was granting the suppression motion on the *Miranda* violation ground only, and was not granting it on the alternative involuntariness ground.

On October 12, 2006, pursuant to Md.Code (2006 Repl.Vol.), section 12–302(c)(3) of the Courts and Judicial Proceedings Article ("CJ"), the State noted this appeal from the circuit court's suppression decision. Rush noted a cross-appeal, challenging the circuit court's ruling that her statements were voluntary, and hence were not subject to suppression on that alternative ground.

This Court issued an order directing Rush to show cause "why the Court should not conclude that the cross-appeal is an interlocutory appeal not allowed by *Raimondi v. State,* 8 Md.App. 468, 261 A.2d 40, *cert. denied* 256 Md. 747 (1970), and *Pearce v. State,* 8 Md.App. 477, 261 A.2d 39 (1970), and not expressly permitted by § 12–302 of the Courts Article and, thus, subject to dismissal pursuant to Md. Rule 8–602(a)(1)." Rush responded, *inter alia,* that even without a cross-appeal this Court has jurisdiction to uphold the suppression ruling on the alternative involuntariness ground that was rejected by the circuit court.

On January 12, 2007, this Court entered an order dismissing Rush's cross-appeal. The cross-appeal was dismissed without prejudice to Rush to argue that this Court has jurisdiction to decide the alternative voluntariness issue.

## DISCUSSION

## I.

### *Miranda Violation*

#### 1. *Pertinent Facts*

Corporal Chinn arrested Rush on the first degree murder warrant and transported her from her aunt's home to Upper Marlboro. After Rush was placed in an interview room, Detective Jernigan entered, introduced himself, and said he wanted to talk to her about Mrs. Caniglia's death. He asked whether Rush had been arrested before, or had had any prior dealings with the police. She responded, "No." He then said, "All right. Before I can talk to ya, I'm sure you're aware, you watch TV, I have to advise you of your constitutional rights. I can't ask you questions until I've done that . . . [a]nd give you a[sic] opportunity . . . to decide if you wanna talk to me or not." Before starting with the advisements, Detective Jernigan said he understood that Rush used to work for the Caniglias, and asked if she knew Antonio; Rush responded that she had worked for the Caniglias about three years prior and that she used to live with them.

Detective Jernigan then proceeded to advise Rush, using a standard Advice of Rights Form, to which he made a handwritten alteration. The form with the alteration stated, in relevant part:

I am now going to read to you your rights under the law. If you do not understand something that I say to you, please stop me, and I will explain it to you.

1. You have the right to remain silent. If you choose to give up this right, anything that you say can be used against you in court.

2. You have the right to talk to a lawyer before you are asked any questions and to have a lawyer with you while you are being questioned.

3. If you want a lawyer, but cannot afford one, a lawyer will be provided to you @ *some time* at no cost.

4. If you want to answer questions now without a lawyer, you still have the right to stop answering questions at any time.

On the original document, the phrase we have italicized and put in bold is the handwritten addition made by Detective Jernigan.

To confirm Rush's literacy, Detective Jernigan had her read a portion of the form aloud. He then read the form to Rush, as follows:

I'm now going to read you your rights under the law. If you do not understand something that I say to you, please stop me and I will explain it to you. You have the right to remain silent. If you choose to give up this right, anything that you say can be used against you in court. You have the right to talk to a lawyer before you're asked any questions. You have the right, you have, you have the right to have a lawyer with you while being questioned. If you want a lawyer and can't afford one, one will be provided to you *at some time* at no cost. If at some point in time during our questioning you decide you don't want to talk anymore, that's your right as well. Okay?

(Emphasis added.)

After reading the Advice of Rights Form, Detective Jernigan asked Rush whether "[a]ll that make sense to ya?" She replied in the affirmative. He then asked several questions to verify that Rush understood the advisements stated in the Form, and had Rush place her initials next to four answers to questions on the form. Rush's initials confirmed 1) that she understood the rights that had been read to her; 2) that she wanted to make a statement at that time without a lawyer; 3) that she had not been offered any kind of reward or benefit nor had she been threatened in any way in order to get her to

make a statement; and 4) that she was not under the influence of alcohol or drugs.

Rush initialed the Advice of Rights Form. Before she signed it, the following exchange occurred:

RUSH: I mean do I need a lawyer or somethin' or is it, am I just in here for—

DETECTIVE JERNIGAN: Well—

RUSH:—questioning? I mean—

DETECTIVE JERNIGAN:—if you decide at that, any point in time during our questioning that you feel that that'd be best for you, then you let me know that. Okay?

RUSH: I'm just wonderin' why it's asking if I need a lawyer. You know, but anything you guys need to know, I'm willing to help.

DETECTIVE JERNIGAN: Sign there for me, and just note on the bottom below your signature what level of education you have.

Thereafter, Rush and Detective Jernigan each signed the form.

At the suppression hearing, Detective Jernigan testified in the State's case-in-chief about advising Rush of her rights, as above. He acknowledged that he had written the words "@ some time" on the form, in advisement 3. He explained that it was his usual practice to insert that phrase in advisement 3 because,

[A lawyer] is not going to magically appear. It's going to take a little time for a lawyer to be provided to her for a representation. You know, that's something that is going to just take a little time. That's all.

Rush testified that she did not remember being advised of her rights, but she did remember being told that a lawyer would be appointed for her "after [she] would go to jail." She then acknowledged, however, that that was said to her only *after* the interrogation had concluded.

## 2. *Standard of Review*

■■■■ In reviewing a circuit court's ruling on a motion to suppress, "[w]e extend great deference to the fact finding of the suppression court and accept the facts as found by that court unless clearly erroneous." *Nathan v. State,* 370 Md. 648, 659, 805 A.2d 1086 (2002) (quoting *Wilkes v. State,* 364 Md. 554, 569, 774 A.2d 420 (2001)). We consider the evidence introduced at the suppression hearing and the reasonable inferences therefrom "that are most favorable to the party who prevailed on the motion." *State v. Harding,* 166 Md.App. 230, 237, 887 A.2d 1108 (2005). We make an independent determination, however, as to whether the circuit court correctly applied the law to facts. *Laney v. State,* 379 Md. 522, 533–34, 842 A.2d 773 (2004).

## 3. *Analysis*

■■■■ In *Miranda v. Arizona, supra,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, the Supreme Court held that, when a criminal suspect is in custody, he must be advised, before police questioning, "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed" before and during questioning. *Id.* at 444, 86 S.Ct. 1602. If a suspect makes a voluntary, knowing, and intelligent waiver of these rights, he may be interrogated without counsel present. *Davis v. United States,* 512 U.S. 452, 458, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994); *North Carolina v. Butler,* 441 U.S. 369, 372–76, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979); *See also Miranda, supra,* 384 U.S. at 444–45, 86 S.Ct. 1602. If during questioning the suspect invokes his right to counsel, questioning must cease until counsel has been provided or the suspect voluntarily reinitiates conversation. *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

The *Miranda* Court explained that, for a waiver to be effective, the required advisements must be given either as stated in that opinion or by means of "a fully effective

equivalent." 384 U.S. at 476, 86 S.Ct. 1602. In the years since *Miranda* was decided, the Supreme Court has clarified that there need not be a "talismanic incantation" of the precise words used in the *Miranda* opinion for the warnings to be deemed effective. *California v. Prysock,* 453 U.S. 355, 359–60, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981) *(per curiam).* See also *Rhode Island v. Innis,* 446 U.S. 291, 297, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (referring to "the now familiar *Miranda* warnings ... or their equivalent").

In the case at bar, we must decide whether Detective Jernigan's alteration of advisement 3 to read, "If you want a lawyer and can't afford one, one will be provided to you *at some time* at no cost[,]" rendered deficient the Miranda warnings as given.

Rush argued below that, because questioning was imminent and indeed had started with some preliminary inquiries, changing advisement 3 to say that, if she could not afford a lawyer (which she could not), one would be appointed for her "at some time[,]" effectively negated advisement 2, that she was entitled to consult a lawyer both before and during questioning. As already mentioned, the circuit court adopted this argument, ruling that the language alteration could lead an indigent lay person such as Rush to misapprehend that she had a right to consult counsel prior to, and during, interrogation.

The State contends that, notwithstanding the addition of the "at some time" phrase, the *Miranda* advisements Rush received clearly and correctly informed her of her right to counsel both before and during interrogation, and that, under controlling Supreme Court case law, that was sufficient. Accordingly, the State maintains, the circuit court's ruling was in error.

The controlling precedent on this issue is the Supreme Court's decision in *Duckworth v. Eagan,* 492 U.S. 195, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989). In that case, Eagan was brought to the station house for questioning after he called the police to report that a woman had been raped and stabbed.

The police read him an advice of rights form that stated, in pertinent part:

> You have the right to remain silent. Anything you say can be used against you in court. *You have a right to talk to a lawyer for advice before we ask you any questions, and to have him with you during questioning.* You have this right to the advice and presence of a lawyer even if you cannot afford to hire one. *We have no way of giving you a lawyer, but one will be appointed for you if you wish, if and when you go to court.* If you wish to answer questions now without a lawyer present, you have the right to stop answering questions at any time. You also have the right to stop answering at any time until you've talked to a lawyer.

*Id.* at 198, 109 S.Ct. 2875 (emphasis in original). Eagan waived his rights and eventually confessed to stabbing the woman. His statement was admitted into evidence at trial and he was convicted of attempted murder.

The United States Court of Appeals for the Seventh Circuit reversed Eagan's conviction, stating that the advice that counsel would be appointed "if and when you go to court[,]" was

> constitutionally defective because it denie[d][the] accused indigent a clear and unequivocal warning of the right to appointed counsel before any interrogation.

*Eagan v. Duckworth,* 843 F.2d 1554, 1557 (7th Cir.1988). Moreover, it "link[ed] an indigent's right to counsel before interrogation with a future event." *Id.*

The Supreme Court reversed the Seventh Circuit, holding that the advice of rights, when evaluated in its totality, satisfied the dictates of *Miranda.* It reasoned, contrary to the analysis of the Seventh Circuit, that the advisements as given, notwithstanding the "if and when you go to court" language, expressly apprised Eagan of his right to have counsel present before he was questioned. The Court noted that the warning properly described the procedure for appointing counsel in the jurisdiction in which Eagan was questioned and that *Miranda* does not require that suspects be given attorneys on the spot. The Court explained:

We think the ... warnings given to [Eagan] touched all of the bases required by *Miranda*. The police told [Eagan] that he had the right to remain silent, that anything he said could be used against him in court, that he had the right to speak to an attorney before and during questioning, that he had "this right to the advice and presence of a lawyer even if [he could] not afford to hire one," and that he had the "right to stop answering at any time until [he] talked to a lawyer." As noted, the police also added that they could not provide [Eagan] with a lawyer, but that one would be appointed "if and when you go to court." The [Seventh Circuit] thought this "if and when you go to court" language suggested that "only those accused who can afford an attorney have the right to have one present before answering any questions," and "implie[d] that if the accused does not 'go to court,' *i.e.[,]* the government does not file charges, the accused is not entitled to counsel at all."

In our view, the [Seventh Circuit] misapprehended the effect of the inclusion of "if and when you go to court" language in *Miranda* warnings. First, this instruction accurately described the procedure for the appointment of counsel in Indiana.... We think it must be relatively commonplace for a suspect, after receiving *Miranda* warnings, to ask *when* he will obtain counsel. The "if and when you go to court" advice simply anticipates that question. Second, *Miranda* does not require that attorneys be producible on call, but only that the suspect be informed, as here, that he has the right to an attorney before and during questioning, and that an attorney would be appointed for him if he could not afford one.

492 U.S. at 203, 109 S.Ct. 2875 (citations and footnotes omitted; emphasis in original).

In so ruling, the Court distinguished *dicta* in its opinion in *Prysock, supra*. There, the police advised Prysock that he had a right to have a lawyer present during questioning and a right to have a lawyer appointed at no cost. Prysock waived his rights and made an inculpatory statement to the police.

Ultimately, he was convicted of first-degree murder in a trial in which his statement was admitted into evidence.

The California Court of Appeals reversed the conviction, concluding that the statement should have been suppressed, as Prysock was not specifically told that he had a right to have an attorney appointed at no cost *before* questioning. *Prysock, supra,* 453 U.S. at 358–59, 101 S.Ct. 2806. The California Supreme Court denied *certiorari. Id.* at 359, 101 S.Ct. 2806. The Supreme Court granted *certiorari* and reversed, holding that the advisements Prysock received satisfied the *Miranda* requirements. In doing so, however, the Court suggested that *Miranda* warnings would not be sufficient "if the reference to the right to appointed counsel was linked [to a] future point in time *after* the police interrogation." 453 U.S. at 360, 101 S.Ct. 2806 (emphasis added).

In *Eagan,* the Court explained that "the vice referred to in *Prysock* was that such warnings would not apprise the accused of his right to have an attorney present if he chose to answer questions. The warnings in [Eagan's] case did not suffer from that defect[,]" however, because they told Eagan that he had a right to counsel before the police asked him any questions and that he had a right to stop answering questions until he could talk to a lawyer. 492 U.S. at 205, 109 S.Ct. 2875.

■ Returning to the instant case, we must, as the Supreme Court explained in *Eagan,* assess the advisements given to Rush in their totality. By means of advisement 2, Rush was told orally and in writing that she had "the right to talk to a lawyer before [being] asked any questions and to have a lawyer with [her] while [she was] being questioned." She then was informed, by means of advisement 3, also orally and in writing, that if she could not afford a lawyer, one would be provided for her at some time, at no cost.

Under the holdings in *Eagan* and *Prysock,* the latter advisement did not violate *Miranda* because the warnings as given told Rush in straightforward language that she had a right to talk to a lawyer before being questioned *and* to have a lawyer present during questioning. Nothing in advisement 2 sug-

gested that the rights being communicated only would obtain if Rush could afford a lawyer, or would differ depending upon indigency. Advisement 3, as altered by the words "at some time[,]" was not inconsistent with the rights communicated in advisement 2. Its message, stated separately from advisement 2 because its topic was not the same, was that, if Rush decided that she wanted a lawyer, *i.e.*, to exercise the right to a lawyer communicated in advisement 2, but she did not have the resources to pay for a lawyer, she would be given a lawyer at no cost and at some time.

As in *Eagan*, the "at some time" language in advisement 3 was added in an attempt to accurately describe the procedure for appointment of counsel in Prince George's County—*i.e.*, that Rush was entitled to a lawyer, if she wanted one, for free, but that her court-appointed lawyer would not "magically appear" the very moment she made the request. Read objectively, this message, unrelated to advisement 2, did *not* tell Rush (as she now argues) that, if she indeed asked for a lawyer right then, she nevertheless would have to undergo questioning without a lawyer until her lawyer arrived "at some time."

█ On this point, Rush argues that her case is distinguishable from *Eagan* and *Prysock*, because Detective Jernigan actually asked her a few questions before advising her of her rights and, by doing so, "created the impression that the interrogation had begun and the advice-of-rights had no bearing on [Rush's] ability to stop [the interrogation]." The record does not support this argument.

Before advising Rush of her rights, Detective Jernigan posed some preliminary questions that quite plainly were meant to orient Rush ("Do you know why you're here?") and to determine whether she had any first-hand familiarity with the *Miranda* warnings before he gave them to her ("You ever been arrested before . . . ?"). When Rush answered the first question in the negative, the detective told her that she was there because he wanted to talk to her about the killing of Mrs. Caniglia, and asked whether she had "any problems

talkin' to me?"—to which she answered "No. That's fine.... Anything you wannna know." And when Rush responded that she had never been arrested before, the detective began the warning process, observing that she probably was aware, from television, that he needed to advise her of her constitutional rights before he could ask her any questions, and to give her the opportunity to decide whether she wanted to talk to him at all. He then proceeded to do so.

These questions were introductory in nature, posed as a prelude to advising Rush of her rights, and were communicated with the warning that it was going to be Rush's decision whether to speak to the police. The questions did not say or imply that Rush had no choice but to continue speaking.

The only other thing that Detective Jernigan said to Rush before advising her was, "I understand you used to work for [the Caniglias] at one time or—know ... Anthony?" Rush did not respond directly to whether she knew Antonio, saying only that she "used to live with them" and "used to work for them about three years ago." Again, this question was asked to orient Rush as to why the detective wanted to question her at all, and did not communicate that she had no choice but to answer his questions, regardless of the rights she was about to be informed of. This brief, introductory pre-*Miranda* questioning does not meaningfully distinguish the case at bar from *Eagan.*

It is significant, moreover, that the remarks Rush made while the *Miranda* warnings were being given, and subsequently during the interview, evidence no confusion about her right to counsel and show that she was willing to speak to the police at the outset of the interview and as it progressed. Rush affirmatively stated that she was willing to talk to Detective Jernigan without a lawyer; and in so doing, she said nothing to suggest that she thought she had no choice in the matter. During the advisements, Rush questioned whether she "needed" a lawyer, *i.e.,* whether it would be best for her to have one, which prompted Detective Jernigan to repeat the

advice that that was her decision and that she could make that decision at any time, and any questioning would cease.

A cautionary note is in order about Detective Jernigan's language addition to the advice of rights form, however. The benefit of having a standard *Miranda* advisement form is that the substance of the information in it, and the order in which the pieces of information are to be communicated, is thought out in advance, with input from counsel and when there is time to ensure that all the advisements required by *Miranda* are fully stated, in a clear and orderly fashion; and there is consistency in delivery, so that all suspects are advised in the same way and the confusion that can accompany improvisation is kept to a minimum, if not eliminated entirely. It is generally not helpful for an individual officer to take editorial license with an advisement form, to add information in anticipation of often-asked follow-up questions.

For the reasons we have explained, we hold that, under the controlling Supreme Court authority, and given the particular circumstances surrounding this interrogation, the circuit court erred in ruling that Rush was not advised of her rights in accordance with *Miranda*, and in granting the motion to suppress her statements from evidence on that ground.

## II.

### *Voluntariness*

Ordinarily, having decided that the circuit court erred by suppressing Rush's statements on *Miranda* grounds, our inquiry would end. We would vacate the court's suppression ruling and remand the case for further proceedings.

As noted, however, Rush asks that we address the alternative voluntariness argument she advanced unsuccessfully below. She argues that her statements were induced by improper promises and threats, and therefore were involuntary and subject to suppression, even if *Miranda* was complied with; and that the circuit court erred in ruling to the contrary. She maintains that this Court has jurisdiction to

review the circuit court's decision on the issue of voluntariness
and uphold that court's suppression ruling on the alternative
involuntariness ground.[1]

### 1. *Jurisdiction to Review*

■■■■ In Maryland, "[a]ppellate jurisdiction is estab-
lished by 'constitutional provisions, statutory provisions, and
rules; jurisdiction cannot be conferred by consent of the
parties.'" *Shofer v. Stuart Hack Co.*, 107 Md.App. 585, 596,
669 A.2d 201 (1996) (quoting *Pearlstein v. Maryland Deposit
Ins.*, 79 Md.App. 41, 48, 555 A.2d 528 (1989)). *See also
Blocher v. Harlow*, 268 Md. 571, 578, 303 A.2d 395 (1973).
The general grant of appellate jurisdiction to this Court, in CJ
sections 12–301 and 12–308, extends to appeals taken from
final judgments. It is a corollary to the general rule that an
interlocutory order, not being a final judgment, is not appeal-
able. *Nnoli v. Nnoli*, 389 Md. 315, 324, 884 A.2d 1215 (2005).
Rather, an immediate appeal of such an order only may be
taken when the right to such an appeal has been created by
statute or when, by operation of the collateral order doctrine,

---

1. One reason Rush offers for why it is important for this Court to
decide, at this interlocutory stage, whether her statements were invol-
untary, is that, if they indeed were involuntary, they may not be used
for impeachment purposes at trial. This argument might have been
relevant had we decided to affirm the circuit court's *Miranda* suppres-
sion ruling, because a statement obtained in violation of *Miranda*, while
not admissible substantively, may be used to impeach a criminal defen-
dant, if the defendant chooses to testify. An involuntary statement
cannot be used against him substantively or for impeachment, as either
use would violate his due process rights. *See Mincey v. Arizona*, 437
U.S. 385, 401–02, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); *Harris v. New
York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). *See also
Brittingham v. State*, 306 Md. 654, 511 A.2d 45 (1986). Because we
have determined that Rush's statements were not obtained by means of
a *Miranda* violation, this distinction is no longer in play in this case,
however. If we do not address the issue of voluntariness, the state-
ments are admissible substantively and for impeachment. If we do
address the issue of voluntariness, and decide in the State's favor, the
same result will obtain. If we address the issue of voluntariness and
decide in Rush's favor, the statements determined to be involuntary will
not be admissible for any purpose.

the interlocutory order is treated as final.[2] *Shofer, supra,* 107 Md.App. at 592–93, 669 A.2d 201. *See also In re Billy W.,* 386 Md. 675, 688–89, 874 A.2d 423 (2005).

 A pre-trial ruling excluding evidence in a criminal case is an interlocutory order that, ordinarily, like any other interlocutory ruling, is not subject to immediate appeal, and only may be challenged, if at all, by the defendant in an appeal from a judgment of conviction, which of course is a final judgment. *See Bruno v. State,* 332 Md. 673, 688, 632 A.2d 1192 (1993) (criminal defendant entitled to appeal after a final judgment of conviction).

By chapter 493, Laws of 1982, the General Assembly enacted Senate Bill 39, carving out an exception to the rule that suppression rulings are not subject to immediate appeal. That legislation, now codified at CJ section 12–302(c)(3), grants the State a limited right of appeal to challenge a decision, made before trial, to exclude evidence from trial. *See Lohss v. State,* 272 Md. 113, 116–17, 321 A.2d 534 (1974) (holding, prior to enactment of CJ 12–302(c)(3), that State had no right to appeal decision to grant a motion to suppress evidence); *McNeil v. State,* 112 Md.App. 434, 448, 685 A.2d 839 (1996) (discussing the history of the State's right to interlocutory appeal); *Raimondi, supra,* 8 Md.App. at 470, 261 A.2d 40 (reaffirming, prior to enactment of CJ section 12–302(c)(3), the "long recognized [ ] principle that an appeal in a criminal case is premature until after final judgment, viz., that appeals from interlocutory orders of the trial court in criminal cases are not allowed"); *Pearce, supra,* 8 Md.App. at 478, 261 A.2d 39.

The legislative objective of SB 39 is to afford the State, in a criminal case, a vehicle to challenge a pre-trial ruling excluding critical evidence so that, if the ruling were erroneous, the

---

**2.** An example of a pretrial ruling that is subject to appeal by a criminal defendant under the collateral order doctrine is an order denying a motion to dismiss made on the ground of double jeopardy. *See Pulley v. State,* 287 Md. 406, 414, 412 A.2d 1244 (1980); *Warne v. State,* 166 Md.App. 135, 139 n. 3, 887 A.2d 657 (2005).

error could be corrected before jeopardy would attach. Without such a right of immediate appeal, the State has no meaningful opportunity for error correction, because under double jeopardy principles and the developed case law on verdicts of acquittal the State cannot appeal from a final judgment in favor of the defendant. As a memo in the bill file states:

> [SB 39] allows the State to appeal from a pretrial ruling by the Court to exclude evidence obtained in violation of the defendant's constitutional rights. The bill is aimed at those cases in which the Judge excludes a defendant's confession, physical evidence (such as drugs), or any evidence which is at the heart of the State's case.

* * *

The State does not now have the right to appeal the trial court's ruling on pretrial evidentiary motions. The trial court can make errors on excluding evidence which effectively terminate the prosecution. If these errors can't be appealed, the case is over at that point and the State can do nothing about it.

In its present iteration, the "State's appeal" statute provides, in relevant part:

> In a case involving a crime of violence . . . ., the State may appeal from a decision of a trial court that excludes evidence offered by the State or requires the return of property alleged to have been seized in violation of the Constitution of the United States, the Maryland Constitution, or the Maryland Declaration of Rights.

CJ § 12–302(c)(3)(i). The statute imposes strict conditions upon the right of appeal it creates. An appeal is permitted only when the evidence suppressed constitutes "substantial proof of a material fact in the proceeding." CJ § 12–302(c)(3)(iii). The State must note the appeal "no more than 15 days after the decision has been rendered" and "before jeopardy attaches to the defendant[,]" CJ § 12–302(c)(3)(ii);

and the State must certify that the appeal is not being taken "for purposes of delay[.]" CJ § 12–302(c)(3)(iii).

In addition, the consequences for the State of pursuing such an appeal unsuccessfully can be severe. In all but homicide cases, if the State does not prevail on appeal, it must dismiss all charges against the defendant, and cannot prosecute the defendant on "those specific charges or on any other related charges arising out of the same incident."[3] CJ § 12–302(c)(3)(iv). The statute further provides that, if this Court does not render a decision within 120 days from the date the record is filed, the motion court's decision stands.[4] CJ § 120–302(c)(3)(iii).

In the instant case, we must determine the scope of the matters open for consideration on appellate review of a pre-trial ruling suppressing evidence, in a State's appeal under CJ section 12–302(c)(3). More specifically, we must decide whether we have jurisdiction to review an alternative ground for suppressing that same evidence, when that alternative ground was raised, but rejected, below. This is a novel issue.

As always, the starting point for statutory interpretation is the language of the statute itself. *Reier v. State Dep't of Assessments and Taxation*, 397 Md. 2, 26, 915 A.2d 970 (2007). In pertinent part, CJ section 12–302(c)(3) grants the State a right of appeal from "a decision of a trial court that excludes evidence offered by the State[.]" This language creates appellate jurisdiction to review the circuit court's suppression decision, but does not further define the scope of appellate review. Of necessity, when the circuit court has decided to suppress evidence on more than one ground, the scope of appellate review covers each ground on which the

---

3. Until 2005, the statute imposed the required dismissal consequence in all cases in which the immediate appeal was permitted. By chapter 328 of the Laws of Maryland 2005, the General Assembly amended the law to exempt homicide cases from the dismissal requirement.

4. In the case at bar, the record on appeal was filed on December 13, 2006. The case was heard by a panel of this Court on March 8, 2007. This Court's opinion was filed by April 12, 2007.

suppression ruling was based. *See, e.g., State v. Tolbert,* 381 Md. 539, 850 A.2d 1192 (2004) (circuit court suppressed confession based upon a *Miranda* violation and a finding that the confession was involuntary; Court of Appeals addressed both grounds, holding that the court erred in suppressing the confession on each ground). In the case at bar, however, the motion court accepted one ground for suppression and rejected the other.

Read narrowly and in its most specific sense, review of a "decision of a trial court [to] exclude[ ] evidence" means a consideration by the appellate court of the circuit court's suppression decision on the ground (or grounds) on which that ruling was made, not on another ground (or grounds) on which the decision was not made. Yet, a more expansive but just as reasonable reading of that same operative statutory language would encompass a general consideration of the suppression ruling, not only on the ground relied upon by the circuit court but also on any alternative ground (or grounds) that was litigated, but rejected, below. The language itself neither defines nor gives a clear answer to the scope of review question.

In another context, the Court of Appeals has narrowly construed CJ section 12–302(c)(3). In *Derry v. State,* 358 Md. 325, 748 A.2d 478 (2000), the question before the Court was whether the State could appeal a pre-trial decision to suppress evidence for violation of the Maryland Wiretapping and Electronic Surveillance Act.[5] Adopting a literal reading of the statutory language, the Court held that CJ section 12–302(c)(3) only permits an immediate appeal from an order suppressing evidence on constitutional grounds; it does not permit such an appeal from a ruling suppressing evidence for violation of a statute.

The Court reasoned that a restrictive reading of the right of appeal created by CJ section 12–302(c)(3) to permit only "constitutionally based exclusions of evidence is more conso-

---

5. That act is codified at *CJ sections 10–401 to 10–414.*

nant with the long-time unavailability of interlocutory appeals that served as precedent to the statute's original passage in 1982." *Id.* at 340, 748 A.2d 478. The Court observed:

> Prior to [1982], Maryland law afforded the State no opportunity to pursue an interlocutory appeal in a criminal case. It was against this backdrop that the General Assembly determined to create a right of interlocutory appeal for the State in only a limited number of criminal prosecutions while explicitly restricting this right in other ways. *Because, again, evidentiary rulings arise innumerably during litigation between the State and criminal defendants, bestowing upon the prosecution the right to challenge every such ruling, even with the proviso that all other prerequisites within 12–302(c)(3) must be satisfied, would reflect an expansiveness directly contrary to the Legislature's ostensibly cautionary approach.* We therefore believe the more reasonable interpretation of § 12–302(c)(3) is that its limitation to constitutional issues, like all other limitations within the statute, applies to every exercise by the State of its right to interlocutory appeal.

*Id.* at 340–41, 748 A.2d 478 (emphasis added).

 It also is noteworthy to our analysis of the scope of appellate review issue that the General Assembly has chosen not to create a parallel vehicle for immediate appeal of pretrial suppression rulings for criminal defendants. To the contrary, the General Assembly has rebuffed efforts to grant criminal defendants a concomitant right to immediate review of decisions denying pretrial suppression motions.[6] Thus, a criminal defendant has no right to immediately appeal a circuit court's decision not to suppress evidence, and has no right to

---

6. An amendment was offered to SB 39 to include language creating a concomitant right of immediate review for criminal defendants of decisions denying pretrial suppression motions. The amendment was rejected. This Court discussed the legislative history of CJ section 12–302(c)(3) in *McNeil, supra,* 112 Md.App. at 452 n. 9, 685 A.2d 839, noting that similar bills extending the right of interlocutory appeal to criminal defendants passed in prior sessions, but were vetoed by Governor Harry Hughes.

pursue a cross-appeal in a State's appeal under CJ section 12–302(c)(3). This is consistent with the statutory objective of equalization; the criminal defendant, unlike the State, is not without remedy if inculpatory evidence is erroneously admitted at trial, as he may raise the error on appeal after a final judgment of conviction. *See Raimondi, supra,* 8 Md.App. at 470–71, 261 A.2d 40. *See also Derry, supra,* 358 Md. at 340–41, 748 A.2d 478; and *McNeil, supra,* 112 Md.App. at 452 & n. 9, 685 A.2d 839 (discussing the legislative intent behind CJ section 12–302(c)(3)).

What little direct Maryland precedent there is would seem, therefore, to militate in favor of the most narrow interpretation of the State's right to appeal a decision to suppress evidence as not including a challenge by the defendant to the court's unfavorable ruling on an alternative ground. On the other hand, the general principles that guide the scope of appellate review, although developed in the context of appeals from final judgments, would seem to have equal application in an interlocutory appeal of this sort; and if applied would support a more expansive interpretation of the "decision of a trial court that excludes evidence" language at issue here.

It is well established in Maryland that, in an appeal from a final judgment, the appellate court may affirm the circuit court's decision on any ground adequately shown by the record. *Paolino v. McCormick & Co.,* 314 Md. 575, 579, 552 A.2d 868 (1989); *Joseph H. Munson Co. v. Sec'y of State,* 294 Md. 160, 167–78, 448 A.2d 935 (1982), *aff'd,* 467 U.S. 947, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984); *Offutt v. Montgomery County Bd. of Educ.,* 285 Md. 557, 564 n. 4, 404 A.2d 281 (1979). This principle is why, in an appeal from a final judgment, the appellee, without noting a cross-appeal, may argue as a ground for affirmance any matter that was tried and decided against him. *Health Servs. Cost Review Comm'n v. Holy Cross Hosp.,* 290 Md. 508, 431 A.2d 641 (1981). *See also Becker v. Crown Cent. Petroleum Corp.,* 26 Md.App. 596, 618–19, 340 A.2d 324 (1975) (stating that, when challenged matters were tried and decided below and presented by the

appellee as alternative arguments, they are properly before the appellate court, even though no cross-appeal was filed). The appellate court's function on review is to determine whether the lower court's ruling was correct, not whether it was correct for the particular reason given by the judge who made it. *See Robeson v. State,* 285 Md. 498, 502, 403 A.2d 1221 (1979) (recognizing that a trial court may be right, but for the wrong reasons).[7]

All of the federal courts of appeal that have been called upon to construe 18 U.S.C. 3731, which is the federal analog to CJ section 12–302(c)(3),[8] and indeed was the model for the Maryland statute, have applied this general scope of appellate review principle and have held that, under the "umbrella" jurisdiction of the government's statutory right to an immediate appeal from a district court's pre-trial ruling suppressing certain evidence, the defendant can assert any alternative ground, supported by the record, to uphold the suppression ruling. *See United States v. Moody,* 485 F.2d 531, 534 (3rd Cir.1973) ("the defendant can raise issues with regard to findings and rulings relevant to [the suppression] order under the umbrella of the government's appeal"); *United States v. Halbert,* 436 F.2d 1226, 1227 (9th Cir.1970) (same).

---

7. In *State v. Lohss,* 19 Md.App. 489, 313 A.2d 87 (1973), *rev'd on other grounds,* 272 Md. 113, 321 A.2d 534 (1974), a State's appeal taken under the predecessor to another subsection of CJ section 12–302, this Court applied the general principle that, on appeal from a final judgment, the circuit court's ruling will be affirmed if, on the record evidence, its ruling was right, even for the wrong reason. Ordinarily, the State cannot appeal an order dismissing an indictment. Subsection (c)(1) (then CJ section 12–302(c)), grants the State the right to appeal. In *Lohss,* in two related cases, the circuit court ruled, pre-trial, that evidence critical to the State's case would be suppressed. In one case, the State acquiesced in dismissal of the indictment; in the other, it moved for dismissal, which was granted. It then noted appeals from the dismissals, in which it sought to challenge the propriety of the suppression rulings. In an opinion authored by Chief Judge Orth, this Court held that the State could challenge the pre-trial suppression rulings in its appeal from the dismissal of the indictments, and determined that the suppression rulings had been in error.

8. Section 3731 grants the Government a right to appeal "from a decision or order of a district court suppressing or excluding evidence."

*See also United States v. Valle Cruz*, 452 F.3d 698, 705 (8th Cir.2006)(holding that in section 3731 appeal appellate court had jurisdiction to consider the defendant's alternative suppression argument that was rejected below because "reasons of judicial economy" made it sensible to do so); *United States v. Cunningham*, 113 F.3d 289, 295 (1st Cir.1997) (holding that, in section 3731 appeal challenging suppression of evidence, appellate court had jurisdiction to "uphold a judgment based on a ground rejected by the district court"); *United States v. Shameizadeh*, 41 F.3d 266, 267 (6th Cir.1994) (ordering the dismissal of defendant's cross-appeal, but noting that "a defendant may present, as part of his brief in the government's appeal, any arguments he may have advanced in the district court which would provide an alternative basis for affirming the order of suppression" even though he "may not assert those arguments as part of [a] separate appeal[ ] or raise any arguments as to evidence not ordered suppressed"); *United States v. Swarovski*, 557 F.2d 40, 49 (2nd Cir.1977) (holding that in section 3731 appeal the appellate court had jurisdiction to consider an "independent" ground that could support the district court's suppression order); *United States v. Finn*, 502 F.2d 938, 940 (7th Cir.1974)(holding that in a section 3731 appeal, the appellate court not only has jurisdiction to uphold the suppression ruling on an alternative ground advanced and rejected below but also has jurisdiction to uphold the suppression ruling on an alternative ground not made below, if the record is sufficiently developed to permit adequate review).

The one state supreme court that has considered the scope of appellate review in a state's immediate appeal from a pre-trial suppression ruling likewise has held that the appellate court has jurisdiction to affirm the suppression ruling on an alternative ground rejected by the lower court. In *People v. Johnson*, 208 Ill.2d 118, 281 Ill.Dec. 38, 803 N.E.2d 442 (2003), the circuit court granted the defendant's pre-trial motion to suppress statements she made to the police, on the ground that her state constitutional right to counsel had been violated. In an immediate appeal permitted by statute, the State challenged that ruling. The supreme court affirmed the suppres-

sion order on the alternative ground, raised and rejected below, that the police had arrested the defendant without probable cause, and that her statements were the fruit of that illegal arrest. *See Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).

Characterizing the appellate issue before it as "the correctness of the circuit court's decision to suppress the two statements defendant made to [the police,]" the court rejected the State's argument that "an appellate court's jurisdiction on appeal from an order suppressing evidence is limited to the specific rationale relied upon by the circuit court." *People v. Johnson, supra*, 208 Ill.2d at 131–32, 281 Ill.Dec. 38, 803 N.E.2d 442. The court concluded, to the contrary, that it is not proper to "define appellate jurisdiction in terms of a legal rationale without any recognition of the fundamental principle that it is the correctness of a lower court's result which is at issue on appeal and not the lower court's reasoning." *Id.* at 134, 281 Ill.Dec. 38, 803 N.E.2d 442.

The Illinois Supreme Court further found unpersuasive the state's argument that appellate consideration of an alternative but rejected ground for suppression is tantamount to permitting the defendant to take an illegal interlocutory cross-appeal. The court reasoned that that would be so if the alternative ground was a "new issue[ ] or defense" on appeal; but when the alternative ground simply was one of the arguments presented to the court below in support of suppressing the evidence, and the factual basis for the alternative ground was fully developed in the suppression hearing, there is no reason why the defendant, as the appellee in an interlocutory appeal, cannot argue that alternative ground, just as an appellee in an appeal from a final judgment can argue any alternative ground, shown by the record, that will support the judgment. *Id.* at 135–36, 281 Ill.Dec. 38, 803 N.E.2d 442 (citation omitted).

█ Our consideration of the law of Maryland and other jurisdictions on the scope of appellate review persuades us that, in a State's appeal from a pre-trial decision to suppress

evidence, pursuant to CJ section 12–302(c)(3), the question properly before this Court, and that we have the power to decide, is whether the circuit court's ruling was correct, for any of the reasons advanced and fully developed below, and not merely whether it was correct for the single reason accepted by the circuit court.

As explained above, the general principle that a reviewing court may uphold the final judgment of a lower court on any ground adequately shown by the record is well-established in Maryland. The legislature created the right of immediate appeal for the State at issue here in order to equalize the opportunities the parties to criminal cases have for meaningful correction of erroneous pretrial evidentiary rulings, made on constitutional grounds. By statute, the State now may challenge for error the pre-trial exclusion of evidence on constitutional grounds, just as the defendant, post-trial, may challenge the admission of that same evidence. The legislative goal of equalization is most thoroughly and efficiently accomplished when the general scope of appellate review principle is applied in the State's immediate appeal as it is in the defendant's appeal from a final judgment.

The purpose of appellate review in either context is to determine whether evidence has been excluded, or admitted, unconstitutionally. In both settings, the party whose position prevailed below should be entitled to assert in support of the ruling every argument made and sufficiently developed below, without being penalized for the circuit court judge's having reached a correct result for a wrong reason.[9] Moreover, because, as the Court of Appeals explained in *Derry*, review in a CJ section 12–302(c)(3) appeal necessarily involves constitutional analysis, which is governed by an expansive review standard, *see Ornelas v. United States*, 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996), the appellate court should not be constrained to reverse a pre-trial ruling excluding evidence

---

**9.** Of course, as we recently explained in *State v. Mason*, 173 Md.App. 414, 919 A.2d 752 (2007), the State may not seek to overturn a pre-trial suppression ruling on a ground it did not raise below.

when, for reasons shown by the record but not accepted below, the evidence was obtained in violation of the defendant's constitutional rights.[10]

To be sure, if a defendant's alternative but rejected argument that, if accepted, would support the lower court's exclusion ruling, is not addressed on immediate appeal by the State, and the court's exclusion ruling is reversed and the evidence is admitted, the defendant still may challenge the alternative ruling on appeal from a final judgment of conviction. As the court in *Finn, supra,* pointed out, however, it is an enormous waste of judicial time and resources, and contrary to policies favoring judicial economy, to delay fully ruling on the correctness of a pre-trial suppression ruling when an immediate appeal has been taken. 502 F.2d at 940.

We therefore hold that this Court has jurisdiction, pursuant to CJ section 12–302(c)(3), to review the correctness of the circuit court's decision to suppress Rush's statements from evidence, both on the *Miranda* ground relied upon by the court and on the involuntariness ground advanced to the court, but rejected by it.

### 2. *Standard of Review*

A circuit court's decision as to whether a confession was given voluntarily "is a mixed question of law and fact." *Knight v. State,* 381 Md. 517, 535, 850 A.2d 1179 (2004); *Winder v. State,* 362 Md. 275, 310, 765 A.2d 97 (2001). We therefore "undertake a *de novo* review of the trial judge's ultimate determination on the issue of voluntariness." *Winder,* 362 Md. at 310–11, 765 A.2d 97. "Although we make our

---

**10.** Although the Supreme Court's *Miranda* rules are not themselves constitutional, they were adopted as a means to enforce defendants' rights under the Fifth Amendment, and therefore "are of Constitutional dimension." *Taylor v. State,* 388 Md. 385, 400, 879 A.2d 1074 (2005) (citing *Dickerson v. United States,* 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000)). A *Miranda* violation ruling therefore is properly the subject of an immediate appeal under CJ section 12–302(c)(3). *See, e.g., Tolbert, supra,* 381 Md. 539, 850 A.2d 1192, in which the Court of Appeals reversed a lower court's decision to suppress evidence on *Miranda* grounds.

own independent appraisal ..., we will not disturb the trial court's factual findings unless those findings are clearly erroneous." *Wengert v. State,* 364 Md. 76, 84, 771 A.2d 389 (2001). The evidence must be viewed in the light most favorable to the prevailing party on the motion. *In Re Joshua David C.,* 116 Md.App. 580, 592, 698 A.2d 1155 (1997). Our task on review is only " 'to judge the voluntariness of the confession based upon the clearly established facts and in accordance with proper constitutional standards.' " *Lodowski v. State,* 307 Md. 233, 252, 513 A.2d 299 (1986) (quoting *Jackson v. Denno,* 378 U.S. 368, 391, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964)).

### 3. *Law of Voluntariness*

It is fundamental that a confession must be voluntary to be admissible in evidence. *Knight, supra,* 381 Md. at 531, 850 A.2d 1179. To be voluntary, a confession must satisfy the mandates of the federal constitution, the Maryland constitution and Declaration of Rights, and Maryland non-constitutional law. *Id.* at 532, 850 A.2d 1179; *Winder, supra,* 362 Md. at 305–06, 765 A.2d 97.[11]

Under Maryland non-constitutional law, a confession must be " 'freely and voluntarily made at a time when [the defendant] knew and understood what he was saying.' " *Hoey v. State,* 311 Md. 473, 481, 536 A.2d 622 (1988) (citation omitted). *See also Taylor v. State,* 388 Md. 385, 400–01, 879 A.2d 1074 (2005); *Knight, supra,* 381 Md. at 531–32, 850 A.2d 1179. Similarly, in order to pass federal and Maryland constitutional muster, a confession must be voluntary, knowing, and intelligent.[12] *See generally Miranda, supra,* 384 U.S. at 444,

---

11. Of course, as discussed in Issue 1, the dictates of *Miranda* also must be satisfied.

12. "The only significant difference between Maryland common law and constitutional principles may be a matter of emphasis." *Young v. State,* 68 Md.App. 121, 129 n. 2, 510 A.2d 599 (1986). This Court has explained that the Maryland common law regarding confessions developed from the view that " 'confessions involuntarily given are inherently unreliable.' " *Id.* (citation omitted). The State and federal constitu-

86 S.Ct. 1602; *Winder, supra,* 362 Md. at 305–06, 765 A.2d 97. *See also Gray v. State,* 368 Md. 529, 550, 796 A.2d 697 (2002) ("Article 22 of the Maryland Declaration of Rights has generally been recognized as being in *pari materia* with its federal counterparts"); *Lodowski, supra,* 307 Md. at 246–47, 513 A.2d 299 (" '[T]he privilege against compelled self-incrimination in Article 22 ... has long been recognized as being in pari materia with its federal counterpart' ") (citation omitted).

■■■■■■ Upon a proper pretrial challenge, the State bears the burden of " 'showing affirmatively that [the defendant's] inculpatory statement was freely and voluntarily made ....' " *Winder, supra,* 362 Md. at 306, 765 A.2d 97 (citation omitted). In that context, "the State must establish the voluntariness of the statement by a preponderance of the evidence." *Id.* Ordinarily, voluntariness is determined based on a totality of the circumstances test:

> In cases where we are called upon to determine whether a confession has been made voluntarily, we generally look at the totality of the circumstances affecting the interrogation and confession. We look to all of the elements of the interrogation to determine whether a suspect's confession was given to the police through the exercise of free will or was coerced through the use of improper means. On the non-exhaustive list of factors we consider are the length of

tional provisions regarding confessions were designed, however, to strike a balance between "the exercise of police power [and] individual rights." *Id. See generally In Re Joshua David C., supra,* 116 Md.App. at 598 n. 4, 698 A.2d 1155 ("It has never been determined that the voluntariness standards under Maryland non-constitutional law and federal and Maryland constitutional law are precisely the same").

In a State's appeal of a pretrial ruling suppressing a defendant's statement, when voluntariness was at issue, the Court of Appeals discussed the constitutional law of voluntariness (federal and Maryland) together with the Maryland non-constitutional law of involuntariness, with emphasis upon the latter. *See State v. Tolbert, supra,* 381 Md. at 555–60, 850 A.2d 1192. Because the non-constitutional Maryland law on voluntariness of confessions is properly analyzed along with the applicable constitutional law, and is in some measure more stringent, the common law voluntariness issue is of Constitutional dimension for purposes of jurisdiction to review under *Derry v. State, supra,* 358 Md. 325, 748 A.2d 478.

the interrogation, the manner in which it was conducted, the number of police officers present throughout the interrogation, and the age, education and experience of the suspect. Maryland law requires that "no confession or other significantly incriminating remark allegedly made by an accused be used as evidence against him, unless it first be shown to be free of any coercive barnacles that may have attached by improper means to prevent the expression from being voluntary."

*Id.* at 307, 765 A.2d 97 (internal citations omitted).

 When a confession is "preceded or accompanied by threats or a promise of advantage," however, those factors are "transcendent and decisive," and the confession will be deemed involuntary "unless the State can establish that such threats or promises in no way induced [it]." *Williams v. State,* 375 Md. 404, 429, 825 A.2d 1078 (2003). *See also Knight, supra,* 381 Md. at 533, 850 A.2d 1179; *Hillard v. State,* 286 Md. 145, 151–53, 406 A.2d 415 (1979). This two-pronged test, often called the *"Hillard* test," was explained by the Court of Appeals as follows in *Winder, supra:*

> We will deem a confession to be involuntary, and therefore inadmissible, if 1) a police officer or an agent of the police force promises or implies to a suspect that he or she will be given special consideration from a prosecuting authority or some other form of assistance in exchange for the suspect's confession, and 2) the suspect makes a confession in apparent reliance on the police officer's statement.

362 Md. at 309, 765 A.2d 97. *See also Taylor, supra,* 388 Md. at 401, 879 A.2d 1074.

 The first prong of the *"Hillard* test" is objective. "We determine whether the police or a State agent made a threat, promise, or inducement." *Id.* at 311, 406 A.2d 415. "The suspect's subjective belief that he or she will be advantaged in some way by confessing is irrelevant. The [hearing court] instead determines whether the interrogating officers or an agent of the police made a threat, promise, or inducement." *Knight, supra,* 381 Md. at 534, 850 A.2d 1179.

"An improper promise or inducement occurs when 'an accused is told, or it is implied, that making an inculpatory statement will be to his advantage, in that he will be given help or some special consideration.'" *Id.* (quoting *Winder, supra,* 362 Md. at 308, 765 A.2d 97). "Courts abhor, or at least find distasteful, promises of leniency or immunity made by state agents to defendants subject to the vulnerability of custodial interrogation." *Reynolds v. State,* 327 Md. 494, 505, 610 A.2d 782 (1992).

"Those statements that have been held to be improper inducements have involved promises by the interrogating officers either to exercise their discretion or to convince the prosecutor [or other judicial official] to exercise discretion to provide some special advantage to the suspect." *Knight, supra,* 381 Md. at 536–37, 850 A.2d 1179 (holding in one of two consolidated cases that interrogating officer's statement to suspect that, "if down the line, after this case comes to an end, we'll see what the State's Attorney can do for you, with your case, with your charges," was "clearly a promise to exercise advocacy on [the suspect's] behalf to convince the prosecutor to exercise discretion in [his] favor[,]" and thus was improper).

*See also Taylor, supra,* 388 Md. at 402–03, 879 A.2d 1074 (holding that interrogating detective's suggestion to the accused that he would make a recommendation to the commissioner about whether to set bail if the accused was cooperative in the upcoming interrogation "clearly constituted an improper inducement—an implication that, if he cooperated by giving a statement of his version of the event to [the detective], he would be given help with the commissioner"); *Winder, supra,* 362 Md. at 317–18, 765 A.2d 97 (interrogating officer's statement that he would try to give the suspect protection from angry friends of murder victim was an improper promise); *Johnson v. State,* 348 Md. 337, 347–48, 703 A.2d 1267 (1998) (interrogating officer's statement that if defendant confessed, he "might be able to receive some sort of 'medical treatment at [a hospital for the criminally insane]' instead of being 'locked up for the rest of [his] life' " was an improper promise); *Stokes v. State,* 289 Md. 155, 157–58, 423 A.2d 552 (1980)

(statement by interrogating officer that he would not arrest the suspect's wife was an improper promise); *Hillard, supra,* 286 Md. at 153, 406 A.2d 415 (interrogating officer's statement, "[I]f you are telling me the truth ... I will go to bat for you" with the prosecutor by telling the prosecutor "that you have cooperated ..., you have told me the truth, and ... I believe you were not knowledgeable as far as the murder was concerned[,]" was an improper promise); *Streams v. State,* 238 Md. 278, 281, 208 A.2d 614 (1965) (statement by interrogating officer that "it would be better for [you] if [you] made a statement because if [you] did they would try to get [you] put on probation" was an improper promise).

▮ On the other hand, a promise by an interrogating officer to do something that as a matter of routine is done for all suspects is not a promise for special consideration, and therefore is not improper. *Knight, supra,* 381 Md. at 536, 850 A.2d 1179 (holding in other of two consolidated cases that interrogating officer's promise to report suspect's cooperation to the prosecutor was not an improper promise of help or special consideration because the officer was required to so report, and thus the suspect "was to be treated exactly as any other suspect would be treated").

Mere exhortations to tell the truth and appeals to a suspect's inner conscience, in and of themselves, have been held not to be improper promises. In *Ball v. State,* 347 Md. 156, 172, 699 A.2d 1170 (1997), for example, an interrogating detective told a murder suspect that it would be " 'much better if [he] told the story' " in his own words, by writing it out in the form of a letter of explanation to the victim's family. The Court of Appeals rejected the argument that this was an implied promise to the suspect that he would be given help or some special consideration in exchange for making an inculpatory statement. *Id.* at 178, 699 A.2d 1170.

*See also Reynolds, supra,* 327 Md. at 509, 610 A.2d 782 (holding that incriminating statements made by defendant who contacted the authorities about his past, was not in custody, was told that his statements could be used against him, and

was not promised anything, were voluntary); *Bean v. State,* 234 Md. 432, 441–42, 199 A.2d 773 (1964) (holding that officer's statement to accused to "get it off his chest" was not an improper inducement); *Ralph v. State,* 226 Md. 480, 486–87, 174 A.2d 163 (1961)(holding that officer's statement to suspect in custody that "it would be better if [the defendant] told the truth" was a mere exhortation to be truthful that did not render the suspect's subsequent statement involuntary); *Nicholson v. State,* 38 Md. 140, 152–54 (1873) (stating in dictum that admonition by interrogating officer to defendant that "I want you to tell the truth" was not an improper promise or inducement); *Clark v. State,* 48 Md.App. 637, 646, 429 A.2d 287 (1981) (holding that interrogating detective's "statement to [the defendant] that there was 'no sense in lying' was a mere exhortation to tell the truth" that did not "imply a benefit in telling the truth").

 Yet, "[a]n entreaty" by an interrogating officer to a suspect to " 'tell the truth' coupled with a promise that there would be benefits to the suspect . . . can render the statement involuntary." *Reynolds, supra,* 327 Md. at 507–08, 610 A.2d 782. In *Biscoe v. State,* 67 Md. 6, 7, 8 A. 571 (1887), the defendant was jailed and then told by the magistrate "that it would be better for him to tell the truth, and have no more trouble about it[.]" The Court held involuntary the confession the defendant then gave, stating that "it was procured by the influence of another under a hope of favor or advantage if made, or fear of harm or disadvantage of some kind if withheld." *Id.* The Court characterized the magistrate's words as in effect telling the defendant that "if you will tell me the truth, it will not only be better for you, but you shall have no more trouble about the matter." *Id.* at 8, 8 A. 571.

 "The second prong of the *Hillard* test triggers a causation analysis to determine whether there was a nexus between the promise or inducement and the accused's confession." *Winder, supra,* 362 Md. at 311, 765 A.2d 97; *see Knight, supra,* 381 Md. at 537–38, 850 A.2d 1179 (holding in the first of two consolidated cases that an interrogating offi-

cer's promise to exercise advocacy on the suspect's part with the prosecutor, although improper, did not induce the suspect's statement, which he made twice, both before and after the improper promise); *Johnson v. State, supra,* 348 Md. at 350–52, 703 A.2d 1267 (holding that officer's improper promise to help defendant receive medical treatment instead of prison time did not induce confession); *Ralph, supra,* 226 Md. at 486–87, 174 A.2d 163.

### 4. *Application of Law to Pertinent Facts*

Rush contends that Detective Jernigan made improper promises during her interrogation that caused her will to be overborne, resulting in her making incriminating statements. At the suppression hearing, Rush testified that she made her inculpatory statements to Detective Jernigan because he promised "to help [her] if [she] told him the truth." On rebuttal, Detective Jernigan denied making any promises to Rush.[13]

The essential questions we must answer are 1) whether, to a reasonable person in Rush's circumstances, any of Detective Jernigan's statements urging her to tell the truth were coupled with a promise, express or implied, that there would be a special benefit in doing so; and 2) if so, whether any such improper promise caused her to make an incriminating statement. Of course, the critical piece of evidence at the suppression hearing was the DVD recording of the interrogation of Rush by Detective Jernigan. The entire interview, from its beginning to the time when Rush reduced her oral incriminating statements to writing, lasted three hours and 56 minutes. We have read the transcript and listened to the digital record-

---

**13.** Rush also presents a brief argument to the effect that Detective Jernigan made an improper threat against her, by, in the course of discussing an infectious disease Rush had been diagnosed with, suggesting that if she did not give an inculpatory statement, she would be "thrown away" without any treatment. The transcript does not support that Detective Jernigan made any such threat.

ing of the interview. Because the interrogation was recorded, there is no factual dispute about what was said.[14]

For context, the interview proceeded in the following general pattern. Early on, Detective Jernigan asked Rush what she knew about the murder. She answered that she had been in Montgomery County that night and had heard about the murder from friends, who saw it reported on television, and later heard more about it when she attended Mrs. Caniglia's funeral.

Detective Jernigan then educated Rush about how data from a cell phone can be used to detect a person's location at a given time, and told her that the police knew from their investigation of Gilbert's cell phone records that she had been with him and with Ellis on the night of the murder, at the location of the murder. He again asked Rush what had happened that night.

Rush then gave a second account of her whereabouts on the night of the murder. She said she had known Ellis for awhile; that she, Ellis, and Gilbert were together driving to the District of Columbia that night; and that, by coincidence, she learned that Gilbert somehow knew Antonio Caniglia. Gilbert then drove the trio to the Caniglias' house, made her get in the driver's seat of the car, and went into the house, all to her surprise. She and Ellis drove away when they saw a police car.

Detective Jernigan told Rush that, except for the very last part about driving away when she and Ellis saw a police car, her story was "bullshit." He admonished that she was in "serious trouble" and gave her a detailed account of the evidence the police had gathered against her. He emphasized that only she (and not Ellis or Gilbert) had any connection to

---

14. As explained above, our standard of review requires deference to the circuit court's non-clearly erroneous first-level factual findings and credibility decisions. *State v. Tolbert, supra,* 381 Md. at 548, 850 A.2d 1192. Here, the material first-level facts are established by the recorded interrogation itself.

the Caniglias and that it was ridiculous to think that, coincidentally, she and Gilbert, who she claimed to have met for the first time that night, both happened to know the Caniglias and where they lived; and that both happened to know that information on a night on which Gilbert was complaining that he needed some money.

Rush then gave a third account of events, this time admitting that, when Gilbert said he needed money, she told him and Ellis about the Caniglias, and that they were wealthy. She then drove the men to the Caniglias' house. At the time, she was drunk, and wanted them to like her. She knew that Ellis had a gun with him. She had seen him use it a few weeks earlier, when he held up a man at gunpoint and stole his marijuana. She told Gilbert and Ellis that she did not want anything to happen that night. When they got to the Caniglias' street and she realized from the cars in the driveway that Mrs. Caniglia and Antonio were at home, she told Gilbert not to go inside the house. He disregarded her and jumped out of the car as it was moving, saying, "Get rich or die tryin'." She and Ellis remained in the car. When Rush saw a police car, she drove off, because she was scared.

Much of the information Rush gave thereafter concerned the details of how she had met Ellis, where he worked, what she knew about Gilbert, whether Antonio could have staged the robbery, and personal information about her own life. Rush had never been in trouble with the law before, and was concerned about her family's learning where she was and about getting her medications. Detective Jernigan arranged for the police to go to the home where Rush was staying in Baltimore County to retrieve her cell phone and medicine.

As previously mentioned, Rush was charged with first degree murder before she was arrested and brought to the Homicide Unit. Throughout the interview, she expressed disbelief that she could be charged with first degree murder when she was not the actual shooter.

### (i) Was there a promise, express or implied, of a special benefit or consideration of leniency?

Rush argues that several remarks Detective Jernigan made to her in between the versions of events she recounted were entreaties to tell the truth that reasonably implied that, if she gave an inculpatory statement, the first degree murder charge against her would be dismissed, or reduced to a lesser charge.[15]

The core of the exchange that preceded Rush's second version of events is as follows:

Q. You're in extremely huge, huge, major trouble. You couldn't be in any worse trouble. You're being charged with first degree murder.

A. What?

Q. *What we need to do is explain and you need to talk to me about everything that happened and why it happened. That's the only way, only way you're gonna get through this, the only way.* I have enough physical evidence in this file right here and no doubt in my mind, physical evidence in this file right here that puts all three of you together. We have an eyewitness who drives by the little red car that belonged to the guy that did the shooting that sees you and JR in that car. He described you to a T, to a T.

A. And what, and what—

Q. And has seen your photographs. There's no question about it. You're sitting in that car outside that house when that shooting happens. JR's in that car also. There's no doubt about this.

A: *How, why am I bein' charged with first degree murder?*

---

**15.** Rush also characterizes Detective Jernigan's remarks as improper threats to have her charged with first degree murder, unless she were to confess. She makes this characterization even though she already was charged with first degree murder before she was arrested, and even though remarks she made during the interview make plain that she knew she already was charged with first degree murder.

Q. *Darlin', darlin', well, until we get all the details as to exactly what happened, how things laid out, there's no way we can get around this.*

A: But I didn't, I didn't—no, I didn't kill anybody and—

Q. Well, I didn't say ya did. I didn't say ya did. Nobody is saying that you killed anybody. We know—

A. *But why am I being—*

Q.—that you were outside—

A.—*charged with first degree murder?*

Q. *Well darlin', you're a part of the whole thing until we can get all the details as exactly what happened. We can't narrow the scope down until we know every little detail about what happened. And that's what you're gonna have to do here today is, is run this—you and I are gonna sit here and we're gonna go over every little detail as to what happened. And there's no way around this. This isn't goin' away. This isn't a dream. This is real. You and I are gonna sit here today and go over every little detail. Until that happens, and we know exactly what happened that day and why it happened, I've got a warrant for ya for first degree murder. Now—*

A. I didn't kill anybody—

Q. I—darlin', I'm not—

A.—and I'm gettin'—

Q. Cindi, I'm not saying you did. I know you didn't. I know you didn't. And that seems like a whole lot, a huge burden on your shoulders about this. But I know you're part of it. I know that you played a part in this because there's no other way. There's no other connection to that family other than through you. There's no other connection. *Now, you can sit here and take the ride, take the charge—*

A. *No, mm-mm—*

Q.—*or we can, or—*

A.—*no, 'cause I didn't* (unintelligible)—

Q.—*we can go over this together*—

A. Mm-mm.

Q.—*and go over every little detail as to what happened and why it happened.*

A. Mm-hmm. I, I was not a part of that. I was not a part of that.

Q. You were there.

A. But I was not a part of that.

Q. Then you tell me how it happened, how it all came down.

A. I was not a part of it at all.

Q. Okay. Then you convince me of that and you tell me how it happened.

A. I was with the wrong people.

Q. Well, there's no question about that. I don't doubt that at all. You have no history at all that, that shows—

A. 'Cause I don't do anything like—

Q. that you do anything like this.

A. I don't.

Q. Well—

A. That's a horrible—

Q.—*somethin' terribly went wrong and only you can explain how we got to where we got to.*

A. *I don't wanna get in trouble for somethin' I didn't do.*

Q. *Well, then now is the time to tell the truth. You were taught all your life if you tell the truth it's the right thing to do. And now is the time to do that.*

Rush then proceeded to give her second version of events (in which by coincidence Gilbert happened to know Antonio), and Detective Jernigan told her that story was "bullshit" and that she was "going to make things ten times worse than they need to be by tellin' lies like this." He gave her more information that the police had gathered about her where-

abouts and that of Ellis and Gilbert on the night of the murder. Detective Jernigan then said,

*[Y]ou need to start sittin' here and tellin' me exactly how this played out. I don't care how severe your part is. Every little bit of the details gotta be true. They've gotta be true. That's the only way, the only way we're gonna get through this, the only way.*

\* \* \*

But you in a situation like you are, a person has no criminal record whatsoever, ya know, you need to step up to the plate and do the right thing.

(Emphasis added). Rush again protested that she did not want to get in trouble for something she did not do, i.e., that she did not actually pull the trigger, to which Detective Jernigan replied:

But you are gonna have to come basically clean on all this. You can't hedge on me. You can't tell me partial truths. *It's gonna have to be identical to, to the way it exactly happened and I know you're thinkin' in your own mind if you tell it that way it's gonna make you look like a bad person. But the truth is the only thing that's gonna make sense here. And people are gonna know that.*

*And if it's a lie, it's just gonna make you look worse and make it easier for somebody to make you look bad. It's got to be unequivocably the truth, no if, ands or buts about it. It's got to be the truth. That's the only way that it's gonna be told the same way. The truth is the only thing that's gonna help you in this situation, the only thing. You need anybody and everybody in your court and on your side. And I'm tryin' to help ya here, I really am.*

(Emphasis added.)

After Detective Jernigan again detailed the cell phone evidence the police had gathered and observed that Rush had shown remorse by sending the Caniglia family a card and flowers, and after Rush talked about an infectious disease she had been diagnosed with, the following exchange took place:

Q. There's no question this [the murder] wasn't supposed to happen. I mean obviously somebody's pressed for some money.

A. Uh-huh.

Q. They know that, that—

A. I'm not.

Q.—you know the Caniglias have money.

A. And I'm not pressed for money either.

Q. Well, I'm not saying you are darlin'. I'm not saying you are. And I'm not saying you're the ... driving force behind this. But what you need to do, Cindi, is sit here and tell me exactly the truth of how this all played out. What you told me was, was a very diluted version of what happened. And a lot of the, the beginning parts of this are lies.

The last part you told me was probably the most accurate part of the whole thing. You sat there, you saw the police car and you drove [a]way. Well, that's after everything's already over. But what you're, what you're changing is what happens to get there, how the conversation comes up, how we decide where to go, what we're gonna do. That's, that's the problem. That's the problem. We need to get all this down to where it's truthful.

*Now, ya know, there, there could be some salvation here for JR as well. I don't, I don't know how big of a part he plays in this. But I can tell ya right now, ya know, if he doesn't come in here and tell the truth, he's, he's in major trouble as well. Neither one of you pulled the trigger in this. Neither one of you went inside. Neither one of you are the person that Jeffrey Gilbert was. So let's get it all out of exactly what happened and why it happened so we can resolve this and get it over with. But you sittin' here lyin' to me is not gonna do it.*

(Emphasis added.) Rush then gave her third, and most incriminating, version of events.

To be sure, some of Detective Jernigan's remarks were mere exhortations to tell the truth, not made in connection with any promise or offer of special benefit, direct or implied.

However, we agree with Rush that several of the detective's comments indeed were implied inducements, in which he suggested that it would be advantageous to Rush, in terms of the charge she was facing, to speak out, and reveal all that she knew about the events leading up to the murder. After Rush gave her first, innocuous, version of events, and then asked why she was being charged with first degree murder, Detective Jernigan answered that "until we get all the details" about exactly what happened, there was "no way we can get around this"; the suggestion being that, if Rush gave details, there could be a way "around this." Soon thereafter, the detective more explicitly stated that "until" Rush gave "every little detail" and told "exactly what happened that day and why," he had "a warrant for [her] for first degree murder." The suggestion, again, was that if Rush cooperated by telling him everything she knew about the events of the night of the murder, the first degree murder charge might go away. The same suggestion was made a third time, when the detective remarked that Rush could "sit here and take the ride, take the charge . . . or . . . we can go over this together, . . . over every little detail. . . ." (Emphasis added.) Detective Jernigan's use of the words "until" and "or" implied that Rush could bring about a change in the status quo (the first degree murder charge) by speaking.

After Rush gave her second version of events, which was somewhat inculpatory, but which Detective Jernigan knew, from the investigation, was not true and greatly understated Rush's role, he continued to imply that she would benefit, legally, by speaking out. He said he was trying to help her do that, suggesting that he could assist her in changing the status quo (the first degree murder charge) if she would reveal in detail precisely what had happened leading up to the murder. He made two references that strongly implied a special benefit from speaking: 1) that there could be "salvation" for Rush if

she told the truth, but, if not, she would remain in "major trouble";[16] and 2) that if Rush were to tell him "exactly what happened and why it happened," "we can resolve this and get it over with...."

Certainly, it was not outside the realm of possibility that Gilbert and/or Ellis had forced Rush, upon threat of physical harm, to give them an address to burglarize, and that she acted under duress; and if indeed that had been her role in the murder, a first degree murder charge would not have been the proper charge, if any. It was possible, therefore, that it would be to Rush's benefit to speak out, if the truth were that she was a victim as well. But Detective Jernigan did not draw any such distinction for Rush; he implied that it would be legally beneficial to her to tell the entire story of her role in the murder, regardless of what that role was. In essence, he let her know that if she told the whole truth about her involvement in the murder, he would help her, there could be "salvation" for her, and they could "resolve this."

These comments went beyond mere pleas to honesty and good conscience. The message they sent was one of hope to Rush that, if she gave Detective Jernigan a full statement (which, based upon the police investigation, he had every reason to think would be inculpatory), he would assist in making the first degree murder warrant go away, so she would not have to "take the ride, take the charge," because the charge would be "resolve[d]." *See Biscoe, supra,* 67 Md. at 8, 8 A. 571(magistrate's statement that it would be better for the defendant to tell the truth "and have no more trouble about it" was an improper inducement).

A reasonable person in Rush's circumstances—age 20, having a 9th grade education, and without any prior involvement or experience with the criminal justice system—would have taken Detective Jernigan's urgings to mean that her legal position would be improved by revealing all she knew; and

---

**16.** These first two remarks ostensibly were made in regard to "JR's" prospects; when read in context, however, they apply to "JR" *and* to Rush.

that he would help her in that effort. Accordingly, Detective Jernigan's remarks to Rush were improper promises of special consideration in exchange for an inculpatory statement.

### (ii) Did the improper promises of special consideration induce Rush's confessions?

As noted above, once it is shown that the interrogating officer made an improper promise of advantage or benefit to a suspect during custodial interrogation, it is the State's burden to prove the causation prong of the *Hillard* test: that the suspect's statement "was 'not made in reliance on a promise or inducement made by a police officer or agent of the police.'" *Taylor, supra,* 388 Md. at 401, 879 A.2d 1074 (quoting *Winder, supra,* 362 Md. at 310, 765 A.2d 97).

In this appeal, the State in its reply brief argues that Rush's inculpatory statements clearly were not induced by Detective Jernigan's implied promises because Rush's reaction, after putting her statements in writing, was inconsistent with any belief that she would be benefited by speaking. If the detective's remarks indeed had induced the statements, Rush would have expressed surprise or at least disappointment when, after making her statements, Detective Jernigan told her that she still stood charged with first degree murder.

We disagree. Two times after giving her final version of events, and then reducing that version of events to writing, Rush asked whether she still was being charged with murder. The first time, Detective Jernigan responded by giving Rush a lengthy explanation of the law of conspiracy, letting her know that the information she had given (which he had told her he already knew, for the most part) supported the first degree murder charge. This was the only point in the interrogation at which it was made plain to Rush that, so long as she had virtually any involvement in the events leading up to the murder, speaking out was not going to benefit her. Of course, by then, she already had fully incriminated herself.

Moreover, after Detective Jernigan responded to Rush's second inquiry about whether she still was being charged with first degree murder by saying, "Your warrant is for murder

... first degree murder," Rush replied, "Because you didn't know what happened. But now that—[.]" Detective Jernigan cut her off, repeating his previous explanation about the law of conspiracy. These inquiries by Rush belie the State's assertion that her inculpatory statements were not induced by the detective's implied promises of advantage. *See Knight, supra,* 381 Md. at 533, 850 A.2d 1179 (quoting *Williams v. State,* 375 Md. 404, 429, 825 A.2d 1078 (2003)) (noting that " 'a confession that is preceded or accompanied by threats or a promise of advantage will be held involuntary, notwithstanding any other factors that may suggest voluntariness, unless the State can establish that such threats or promises in no way induced the confession' ").

The State points out, as we have discussed in Part I, that Rush made several remarks indicating that she was speaking willingly. Indeed, at one point, when Detective Jernigan said he was trying to help Rush, she responded, "No, you're not. You're tryin' to go against me.... You're tryin' to put me away." The problem with the State's argument, however, is that Rush became most willing to speak, and gave the most incriminating statements, after Detective Jernigan made the improper implied promises that she would benefit by speaking.

On the evidence adduced at the suppression hearing, reviewed *de novo,* we cannot say that the incriminating statements Rush made after Detective Jernigan's implied promises that she would receive a special benefit, by elimination or reduction of charges, if she spoke, "in no way" resulted from those improper promises. The total circumstances of the interrogation in this case lead us to conclude that the statements Rush made after Detective Jernigan's implied promises were not freely and voluntarily given, under federal and Maryland constitutional law and under Maryland non-constitutional law. The inculpatory statements made by Rush after she was advised of her rights under *Miranda* but before Detective Jernigan's implied promises of benefit are admissible, however.[17] Accordingly, we shall affirm the order of the

---

17. The precise portion of the interrogation that is admissible is, by transcript reference, from page I-7, line 22 through I-13, line 6. It

circuit court suppressing Rush's statements from evidence, in part, and vacate it in part.

**ORDER SUPPRESSING STATEMENTS BY THE APPELLEE FROM EVIDENCE AFFIRMED IN PART AND VACATED IN PART, AS STATED IN THIS OPINION. CASE REMANDED TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID 90% BY PRINCE GEORGE'S COUNTY AND 10% BY THE APPELLEE.**

---

includes Rush's admission, in response to Detective Jernigan's questions, that, on the night of the murder, she and "JR" and "the guy who killed Ms. Caniglia" were "at the same location at the same time."